**CALIFORNIA DEPARTMENT OF HEALTH SERVICES, et al., Plaintiffs,**

v.

**Bruce BABBITT, et al., Defendants,**

and

**Committee to Bridge the Gap, Intervenor–Defendants.**

**U.S. Ecology, Plaintiff,**

v.

**Bruce Babbitt, et al., Defendants,**

and

**Committee to Bridge the Gap, Intervenor–Defendants.**

Nos. Civ.A. 97–218(EGS), Civ.A. 97–365(EGS).

United States District Court, District of Columbia.

March 31, 1999.

Cynthia Larson, Orrick, Herrington & Sutcliffe LLP, Sacramento, CA, Karl Lytz, Latham & Watkins, San Francisco, CA, Peter Winick, Latham & Watkins, Washington, D.C., Laurence H. Levine, Latham & Watkins, Chicago, IL, for plaintiffs.

Ann D. Navarro, U.S. Department of Justice, Environment and Natural Resources Division, Washington, D.C., for defendants.

Eric R. Glitzenstein, Meyer & Glitzenstein, Washington, D.C., for intervenors.

Stephen L. Kowalewski, Sacramento, CA, for amicus Southwestern LLRW Comm'n.

Lilia Lopez, Assistant Attorney General, Olympia, WA, for amicus Northwest Interstate Compact on LLRW Management.

Laurie J. Loveland, Solicitor General, Office of Attorney General, Bismark, ND, for amicus State of North Dakota.

John Louis Longstreth, Preston Gates Ellis & Rouvelas Meeds LLP, Washington,

D.C., for amicus Gray Davis and for intervenor-applicants Fort Mojave Tribe.

Valerie Stanley, Rockville, MD, for amici Ruth Galanter, Jackie Goldberg.

James B. Dougherty, Washington, DC, for amicus Sheila James Kuelh.

Alvin J. Lorman, Mintz Levin, Cohn, Ferris, Glovsky & Popeo, Washington, D.C., for amicus American College of Nuclear Physicians and for amicus Society of Nuclear Medicine.

James Curtiss, Winston & Strawn, Washington, D.C., for Amicus Health Physics Society.

David P. Sheldon, Eugene R. Fidell, Feldesman, Tucker, Leifer, Fidell & Bank LLP, Washington, D.C., for amicus County of San Bernadino.

Fran M. Layton, Shute, Mihaly & Weinberger, San Francisco, CA, for amicus County of San Bernadino.

Louise Renne, City Attorney, Alison Stewart, Deputy City Attorney, San Francisco, CA, for amicus City of San Francisco.

James B. Slaughter, Beveridge & Diamond, PC, Washington, DC, for amicus California Radioactive Materials Management Forum.

James Kawahara, Preston Gates Ellis & Rouvelas Meeds LLP, Los Angeles, CA, for intervenor-applicants Fort Mojave Tribe.

## MEMORANDUM OPINION & ORDER

SULLIVAN, District Judge.

In the waning hours of the Bush Administration, outgoing Secretary of the Interior Manuel Lujan Jr. ("Lujan") issued a Record of Decision ("ROD") under the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321, *et seq.* announcing his decision to approve the direct sale of 1,000 acres of federal land under the Federal Land and Policy Management Act ("FLPMA"), 43 U.S.C. §§ 1713, 1719(b), to the State of California for potential use as a low-level radioactive waste ("LLRW") facility. Earlier that day, January 19, 1993, a United States District Judge in the Northern District of California had orally extended a Temporary Restraining Order further enjoining Secretary Lujan from, *inter alia*, taking any action in connection with the transfer of this land. Secretary Lujan's 11th-hour decision was his final step in a protracted administrative process regarding this highly controversial issue.

Weeks before making his land-transfer decision, Secretary Lujan had notified some of the multitude of interested parties that the transfer could not be accomplished before the change in Administrations. Then two weeks before the end of the Bush Administration, and two days after receiving a request from then-Governor Pete Wilson ("Wilson") of California to complete the land transfer, Secretary Lujan abruptly changed position, and took certain actions in an attempt to complete the transfer. A month after Secretary Lujan issued his ROD, President Clinton's Secretary of the Interior, Bruce Babbitt, ("Babbitt") rescinded it.

Plaintiffs California Department of Health Services and its Director, Kimberly Belshé (collectively, "CDHS") and U.S. Ecology, Inc., bring this action against Secretary Babbitt, the Department of the Interior ("DOI"), the Bureau of Land Management ("BLM"), and John Garamendi, Deputy Secretary of the Interior. Relying on the Mandamus Act, 28 U.S.C. § 1361, plaintiffs ask this Court to compel defendants to convey the land, located in the Ward Valley of California, to be used as a nuclear dump. Plaintiffs also allege that Secretary Babbitt violated the Administrative Procedure Act, 5 U.S.C. § 706(2)(A) ("APA"), when he rescinded Secretary Lujan's ROD.

Intervenor-Defendants, Committee to Bridge the Gap, the Bay Nuclear Waste Coalition, Ward Young, and Ernest Goitein, oppose the sale of the Ward Valley

land alleging that the government has not complied with certain environmental statutes.

Defendants and intervenor-defendants have moved for summary judgment on all of plaintiffs' claims. Plaintiffs CDHS and U.S. Ecology seek partial summary judgment on their claim that they are entitled to mandamus relief. U.S. Ecology also seeks summary judgment on its claim that Secretary Babbitt's actions in rescinding Secretary Lujan's ROD was arbitrary and capricious. The Court has considered the parties submissions as well as the briefs filed by numerous groups as amicus curiae,[1] and for the following reasons, the Court will grant defendants' motion for summary judgment, grant the intervenor's motion for summary judgment, and deny plaintiffs' motions for partial summary judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In 1987, California, Arizona, North Dakota and South Dakota entered into the Southwestern Low–Level Radioactive Waste Disposal Compact, to establish a regional disposal site for LLRW, pursuant to the Low–Level Radioactive Waste Policy Act Amendments of 1985, 42 U.S.C. §§ 2021(b)–(j) (1994).[2] Under California law, the CDHS is the agency responsible for managing the disposal of LLRW, consistent with the Interstate Compact. U.S. Ecology, Inc. was chosen as the license-designee to develop the LLRW facility under CDHS's oversight and was granted the license for the facility in September 1993. U.S. Ecology is therefore responsible for building and operating the facility, and for collecting fees from the eventual users of the facility.

California, as the initial host state under the compact, proposed to use the 1,000–acre parcel in the State's Ward Valley as the site of the LLRW facility. This parcel is presently owned by the federal government, and managed by BLM. To acquire this land, the California State Lands Commission ("SLC") submitted to BLM a series of school land indemnity applications beginning in 1987, under 43 U.S.C. § 851, seeking to acquire the Ward Valley site.[3] Based on this application, BLM and CDHS issued a joint Environmental Impact Statement/Environmental Impact Report ("EIS/EIR") in April 1991 assessing the environmental impacts of, and alternatives to, using the proposed Ward Valley site as a LLRW facility, as required under NEPA and California law.[4] This 500–page report

1. Amicus in this case who have filed briefs stating their positions are the Southwestern LLRW Commission, the Southeast Compact Commission for LLRW, the Northeast Interstate LLRW Commission, the Northwest Interstate Compact on LLRW Management, the State of North Dakota, California Lt. Governor Gray Davis, Ruth Galanter and Jackie Goldberg, City Councilwomen·for the City of Los Angeles, Sheila James Kuelh, Speaker Pro Tempore of the California Legislature, the American College of·Nuclear Physicians, the Society of Nuclear Medicine, the Health Physics Society, the County of San Bernadino, the City of Los Angeles, the City and County of San Francisco, the California Radioactive Materials Management Forum.

2. This Act makes each state responsible for low-level radioactive waste disposal, and authorizes states to form compacts for the establishment and operation of regional disposal facilities for low-level radioactive waste. It also sets forth requirements and incentives concerning the development of these regional disposal facilities.

3. The school land indemnity selection process arises from California's admission to the United States, at which time the Union granted California a certain number of acres of land for public schools. If the lands the state chose had been disposed of, the State could choose substitute or "indemnity" lands. The Secretary of Interior has discretion to approve the disposal of public lands through this process. 43 U.S.C. § 315f. Under this process, the filing of an application by the State Lands Commission initiates a 2 year period during which the land is segregated so that it will not be leased or sold until the application is completed.

4. California state law provides that an EIR must be prepared under similar circumstances as require an EIS under NEPA. *See* California Environmental Quality act,

concluded that the Ward Valley site was the preferred location for the facility, and that locating the facility there would result in no significant adverse environmental impacts. Under California law, CDHS is required to certify the adequacy of the final EIR. Even though the EIS/EIR had been issued, BLM did not issue an ROD based upon the EIS/EIR because CDHS did not certify the adequacy of the EIR.

Then in July 1991, SLC requested that BLM suspend processing its pending indemnity selection application. One year later, on July 13, 1992, CDHS requested that BLM sell the Ward Valley site directly to the State, pursuant to FLPMA, rather than through indemnity selection. But on September 17, 1992, SLC filed a revised indemnity selection application for the land, initiating a new two-year segregation period. In response to CHDS's request that the land be sold under FLPMA rather than through the indemnity selection process, BLM took two actions: On September 21, 1992, BLM published a Notice of Realty Action ("NORA"), initiating the 45–day comment period regarding the direct sale under 43 C.F.R. § 2711.1–2. BLM received approximately 200 comments opposing the direct sale. In addition, BLM published a notice of intent to commission a Supplemental EIS ("SEIS") to study whether adverse environmental consequences would result from transferring the Ward Valley site by direct sale rather than indemnity selection. On November 12, 1992, the draft SEIS was made public for comment, and the comment period remained open until December 28, 1992. Two days after the close of the public comment period on the draft SEIS, BLM issued a final SEIS finding that the change in method of sale, from indemnity selection to direct sale, would have no adverse environmental consequences.

The next day, on December 31, 1992, CDHS asked BLM to delay completion of the NEPA process, by postponing the release of the final SEIS, to enable CDHS to provide a more comprehensive response to the public comments on the draft SEIS. *See* Defs.' Ex. 25 (Ltr. from Ron Joseph, Chief Deputy Director, CDHS, to Ed Hastey, Regional Manager, BLM, of 12/31/92). Nevertheless, on that same day, BLM filed its final version of the SEIS, pursuant to 40 C.F.R. § 1506.9, triggering the 30 day comment period required by 40 C.F.R. § 1506.10(b).

As late as December 1992, Secretary Lujan and BLM continued to advise the public that DOI would not be able to issue a patent for the land to the State of California prior to the end of the Bush Administration. In a December 1992 letter to the Governor of North Dakota, Secretary Lujan wrote:

[W]ithin the time remaining in this Administration and with our commitment to carrying out all legal and required steps, including National Environmental Policy Act compliance, I am sorry to inform you that we will not be able to issue [a] patent to the State of California.

We may be able to clear up some of the preliminary administrative actions necessary, but, unfortunately, we must leave this unfinished job to the next administration to complete the land transfer to the State of California.

Int.Ex. T (Ltr. from Sec'y Lujan to the Gov. of N.D., undated in record). BLM indicated that the patent would not be issued because of BLM's "commitment to carry out all legal and required steps, including [NEPA] compliance." Int.Ex. S (Ltr. from Ray Brady, Chief, Division of Lands, to Terry Grimmer, Environmental Manager, Berlex Biosciences, 12/31/92).

Then, on January 5, 1993, Governor Pete Wilson requested that Secretary Lujan complete the land transfer prior to the end of the Bush Administration despite the fact that the public comment period on the SEIS was open until the end of January 1993. Defs.' Ex. 26 (Ltr. from Gov. Wilson

("CEQA"), Cal.Pub.Res.Code § 21000 *et seq.;* *see infra* Part II.A.

to Sec'y Lujan, 1/5/93). Governor Wilson suggested that the SEIS was "more appropriately" an Environmental Assessment ("EA"), and that this EA would form the basis for issuing a Finding of No Significant Impact ("FONSI") under NEPA. *Id.* This, explained Governor Wilson, would allow the direct sale of the land to occur without having to await the close of the additional 30–day notice period for comments on the final SEIS. *Id.* at 2. This comment period was set to end after the end of the Bush Administration.

Two days later, on January 7, 1993, Secretary Lujan notified BLM that the SEIS was in fact an EA, that the comments regarding the SEIS had already been adequately addressed, and that he was contemporaneously issuing a FONSI. *See* Defs.' Ex. 29. In addition, Secretary Lujan advised BLM that he had instructed the Board of Land Appeals to issue decisions on the pending appeals by the next day, January 8, 1993.[5] *See id.* Secretary Lujan also listed the actions he planned to take contingent on those appeals being resolved in Interior's favor: He stated that he planned to issue a ROD approving the direct sale, dismiss the comments received in response to the NORA, return SLC's pending indemnity application, and issue the patent with certain conditions. A press release that same day publicized this announcement. Although under Secretary Lujan's decision, the State of California would receive the patent to the land, U.S. Ecology wired $500,000 to the U.S. Treasury to pay for the 1,000 acre Ward Valley site the next day. This money was later returned to U.S. Ecology.

Lujan's actions spawned three lawsuits in California. On January 8, 1993, a group of environmental associations and individuals concerned about the environmental implications of the proposed sale filed an action in the Northern District of California seeking declaratory and injunctive relief. *See Desert Tortoise v. Lujan,* No. 93–0114 (N.D.Cal., Jan. 8, 1993). In their complaint, plaintiffs alleged, in part, that Secretary Lujan violated the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531 *et seq.,* by failing to designate a critical habitat for the desert tortoise, a threatened species. Plaintiffs moved for a temporary restraining order and preliminary injunction to enjoin the commitment of "any further resources towards the completion of the proposed Radioactive Waste Facility" until the underlying ESA issues were resolved. *Desert Tortoise* Compl. at ¶ 33. United States District Judge Marilyn Patel granted the plaintiffs' request for a temporary restraining order that same day, January 8, enjoined the Secretary from "transferring any Ward Valley land" and scheduled a hearing for January 19, 1993 on the motion for a preliminary injunction.

On January 19, 1993, a series of events transpired. First, in the morning, Judge Patel held a hearing in the *Desert Tortoise* case and orally extended the TRO, which was set to expire on that date. At that hearing, the Assistant United States Attorney ("AUSA") on the case stated that since the TRO restrained Secretary Lujan from transferring title to the land to the State, the Secretary had not signed the patent. Defs.' Ex. 34 (*Desert Tortoise v. Lujan,* No. C–93–0114, Tr.Hr'g. January 19, 1993, at 16). The AUSA stated that signing the patent "in and of itself would not have resulted in a transfer of title." *Id.* The AUSA further stated that depending upon Judge Patel's ruling, "the Secretary would like to sign the patent, but not transfer title to the state." The AUSA stated that depending upon Judge Patel's ruling, "[t]he Secretary would also propose to sign the Record of Decision, which would be a further step towards accomplishing this transfer. All of these steps were—were not taken on advice that this might be a violation of the spirit of the Court's temporary restraining order." *Id.* at 17.

5. The decisions denying these appeals were actually issued on January 11, 1993.

Second, sometime after the hearing before Judge Patel, Secretary Lujan issued the ROD stating his approval of the direct sale and his intention to convey the land by direct sale. In the ROD, Secretary Lujan stated that the Ward Valley sale complied with the NEPA and ESA, and concluded that the conditions for direct sale pursuant to the FLPMA had been met. Secretary Lujan did not, however, issue the patent, nor is there any indication in the record before the Court that he took any actions during his final moments in office to effectuate his decision under FLPMA regulations.

Third, at 6:25 p.m. California time, Judge Patel's written order was filed in the *Desert Tortoise* case, extending the TRO and enjoining DOI from "executing any document or taking any other action, including but not limited to signing any patent, in connection with any transfer of any land in Ward Valley, California, to the State of California." *See* Defs.' Ex. 35 (Order Extending Temporary Restraining Order, at 2).

Also on January 19, 1993, a group of plaintiffs consisting of an environmental group, a municipality, then-State Controller Gray Davis, in his official capacity, and individuals who derive enjoyment from the Ward Valley site, commenced *Committee to Bridge the Gap, et al. v. Lujan,* Case No. 93–196 (N.D.Cal.).[6] Plaintiffs alleged, in part, that Secretary Lujan (1) failed to fully consider the supplemented EIR/EIS and comments submitted during the comment period, in violation of the NEPA, and (2) failed to establish that the proposed transfer is in the public interest, in violation of the FLPMA. Plaintiffs sought to enjoin defendants from issuing a ROD until defendants had complied with the law. Days later, on January 27, 1993, seven environmental associations commenced *National Resources Defense Council v. Babbitt,* No. 93–0301 (N.D.Cal.), the third action concerning the proposed sale and development of the Ward Valley site.

Plaintiffs in that case advanced substantially the same claims as plaintiffs in *Desert Tortoise.*

On February 18, 1993, newly-appointed Secretary Bruce Babbitt entered into a stipulated settlement in *Desert Tortoise* and rescinded the ROD issued by former Secretary Lujan. Secretary Babbitt's rescission of that decision, announced in a Declaration filed in that case as well as in a press release stated:

1. On January 7, 1993, my predecessor, Secretary Manuel Lujan, issued a news release announcing his intention to proceed with a direct sale to the State of California of a 1,000 acre tract of land, owned by the United States, in the Ward Valley, San Bernardino County, California, subject to certain contingencies.

2. On January 8, 1993, an order was issued by the United States District Court for the Northern District of California temporarily restraining the Secretary from transferring any land in the Ward Valley until the court rules on a preliminary injunction motion.

3. On January 19, 1993, Secretary Lujan signed a Record of Decision approving the direct sale to the State of California of the Ward Valley Lands.

4. After reviewing the Record of Decision and the circumstances surrounding the issuance of that document, I have decided to rescind, and hereby do rescind, the Record of Decision with the intention of restoring the *status quo ante* as of December 28, 1992, the date of the close of the public comment period on the Supplemental Environmental Impact Statement on the disposition of the Ward Valley Lands.

5. This action is being taken in order to allow a review of the proposed disposal of the Ward Valley Lands and to

---

6. Committee to Bridge the Gap is an interve-

nor in the present action.

ensure that all applicable Federal laws are complied with.

Defs.' Ex. 40 ¶¶ 1–5.

Shortly thereafter, on March 6, 1993, Judge Patel issued an order in *Committee to Bridge the Gap* incorporating the stipulations of the parties, setting forth Secretary Babbitt's rescission of former Secretary Lujan's ROD, and requiring that DOI provide 30 days notice prior to undertaking actions to effectuate the transfer of Ward Valley. Judge Patel did not dismiss the case, but rather took it off the active calendar, formally staying it. *See* Defs.' Mot. Transfer Venue, Ex. 12 (Order of Jan. 20, 1994).

On May 7, 1993, Judge Patel issued an order in *Desert Tortoise,* incorporating a stipulation by the parties substantially similar to that issued by the parties in *Committee to Bridge the Gap* and granted, on July 14, 1993, plaintiffs' motion for partial summary judgment. On April 25, 1994, Judge Patel dismissed *Desert Tortoise* in a Stipulated Dismissal. On November 2, 1993, Judge Patel entered a final judgment ordering the dismissal of *Natural Resources Defense Council,* incorporating the parties' Stipulation for Dismissal set forth on September 14, 1993.

On January 31, 1997, CDHS filed its complaint asking this Court to compel defendants to perform their alleged ministerial duty of delivering the patent for the Ward Valley site to the State, pursuant to former-Secretary Lujan's ROD, and alleging that Secretary Babbitt's recission of that ROD was arbitrary and capricious in violation of the APA.[7] On February 24, 1997, U.S. Ecology filed its complaint in the case presently before the Court, raising substantially similar claims. The two cases were consolidated on October 27, 1997.[8]

The multiple claims in each complaint in these consolidated actions boil down to two issues: whether plaintiffs are entitled to mandamus relief and whether Secretary Babbitt's decision to rescind Secretary Lujan's decision in the ROD was arbitrary and capricious under the APA. In making this determination, the Court looks to the relevant substantive statutes forming the bases of plaintiffs' APA claims—the FLPMA and NEPA. *See El Rescate Legal Serv., Inc. v. Executive Office of Immigration Review,* 959 F.2d 742, 753 (9th Cir. 1991) (citing *Lujan v. National Wildlife Federation,* 497 U.S. 871, 883, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990). These substantive statutes do not provide separate causes of action as they necessarily underlie and give content to, plaintiffs' APA claim. *See id.* Furthermore, although the U.S. Ecology plaintiffs ask this Court to enforce Secretary Lujan's ROD, because Secretary Lujan's decision was rescinded, the decision the Court must examine is Secretary Babbitt's. As this Court stated

7. In its complaint, CDHS asserts five claims for relief consisting of a claim for failure to perform ministerial duty and claims that defendants exceeded their authority in violation of the APA, FLPMA, and NEPA by failing to deliver the patent.

8. U.S. Ecology brings seven claims, the first two of which, for mandamus relief and for abuse of discretion in rescinding the sale, mirror CDHS's first two claims. In its next three claims, U.S. Ecology asserts that defendants have abused their discretion, in violation of the APA and NEPA, in continuing to fail to transfer the Ward Valley site to California through their actions from February 1993 to the present. U.S. Ecology also alleges that defendants have delayed transfer of the land in bad faith and for political reasons, by requiring additional unnecessary tests and reviews, even though defendants have stated on several occasions that transfer of the land would be in the public interest and that no safety concerns exist. In its sixth claim, U.S. Ecology alleges that defendant Garamendi abused his discretion by providing false information to the press and by advancing his antinuclear agenda through his office. Finally, U.S. Ecology alleges that by rescinding Secretary Lujan's action, defendants violated the APA by acting contrary to plaintiff's constitutional rights, specifically U.S. Ecology's property interest created by Secretary Lujan's decision to sell the Ward Valley site, without notice or hearing.

at a preliminary status hearing in this case:

> The summary judgment issues, as I view them, should relate to Secretary Babbitt's actions up through February, 1993, though. That's my focus. I don't think I need to proceed any further than that for the purposes of resolving issues in this case.

Hr'g Tr., Oct. 23, 1997. In addition, as the parties agreed at the motions hearing in this case, the issue before this Court is not whether a contract was established,[9] but whether Secretary Babbitt's decision was arbitrary and capricious under the APA.

## II. DISCUSSION

### A. Plaintiffs' APA Claim

 Under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). In reviewing whether agency action was arbitrary and capricious, the Court is deferential to agency action, *See Environmental Defense Fund, Inc., v. Costle*, 657 F.2d 275, 282 (D.C.Cir.1981); *Ethyl Corp. v. EPA*, 541 F.2d 1, 34 (D.C.Cir.1976) (en banc), and presumes the agency's action to be valid. *See Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 419, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). Moreover, the "arbitrary and capricious" standard is a narrow one, which forbids a court from substituting its judgment for that of the agency. *See Citizens to Preserve Overton Park, Inc.*, 401 U.S. at 416, 91 S.Ct. 814; *See also Ethyl Corp. v. EPA*, 541 F.2d at 34. As the Court stated in *State Farm Mutual Auto. Ins. Co.*, "[w]e may not supply a reasoned basis for the agency's action that the agency itself has not given," 463 U.S. at 43, 103 S.Ct. 2856, but a court should "uphold a

decision of less than ideal clarity if the agency's path may reasonably be discerned." *Id.* (quoting *Bowman Transp. Inc. v. Arkansas–Best Freight System, Inc.*, 419 U.S. 281, 286, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974)). In making this determination, the Court reviews whether the agency action was arbitrary and capricious based upon the administrative record that was before the decisionmaker at the time he made his decision. *See Citizens to Preserve Overton Park, Inc.*, 401 U.S. at 420, 91 S.Ct. 814.

NEPA, the "basic national charter for protection of the environment," 40 C.F.R. § 1500.1, requires that whenever a federal agency undertakes "major federal actions significantly affecting the quality of the human environment," 42 U.S.C. § 4332(c), it must first prepare an Environmental Impact Statement ("EIS"). "An exception to th[e] requirement [of preparing an EIS] applies when a less comprehensive environmental review, or environmental assessment ("EA"), provides a basis for a finding of no significant impact ("FONSI")." *Coalition of Sensible Transportation v. Dole*, 826 F.2d 60, 66 (D.C.Cir.1987) (citing 40 C.F.R. § 1501.4(b), (c), & (e) (1986) (describing process); id § 1508.9 (defining EA); id. § 1508.13 (defining FONSI) *Sierra Club v. Dep't of Transportation*, 753 F.2d 120, 126 (D.C.Cir.1985)). In the usual case, "[i]f a finding of no significant impact is made after analyzing the EA, then preparation of an EIS is unnecessary." *Sierra Club*, 753 F.2d at 126. Thus under NEPA, an agency's final action will be either an EIS or a FONSI.

NEPA regulations provide that the agency announce its decision among the alternatives analyzed in the EIS in the ROD. 40 C.F.R. § 1505.2. Prior to the issuance of the ROD, the agency is precluded from taking action that would limit its choice of alternatives. *Id.* at

---

9. Subsequent to this action, plaintiff U.S. Ecology filed a lawsuit in the U.S. Court of Federal Claims, in which CDHS is a third-party plaintiff, alleging that the United States breached a contract by refusing to transfer the Ward Valley site to California. *U.S. Ecology, Inc. v. United States*, No. 97–65 (filed January 30, 1997).

§ 1506.1(a). The decision announced in the ROD is implemented after the ROD is issued. 40 C.F.R. § 1505.3. No regulations preclude the Secretary of the Interior from rescinding or withdrawing a ROD after it has been issued. *See generally* 40 C.F.R. § 1505.1, *et seq.; Oregon Natural Resources Council v. Harrell,* 52 F.3d 1499, 1502 (9th Cir.1995). Consequently, the only restraint on Secretary Babbitt's decision to rescind the ROD was the APA.

The procedures set out in the regulations enacted to effect the purposes of NEPA require agencies to take a "hard look" at environmental consequences, but, "NEPA itself does not mandate particular [substantive environmental] results." *Robertson v. Methow Valley Citizens Council, et al.* 490 U.S. 332, 350, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989).

> The NEPA process involves an almost endless series of judgment calls .... [the role of the courts in reviewing the judgment calls made by the agency] is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary and capricious.

*Coalition of Sensible Transportation v. Dole,* 826 F.2d at 66 (internal quotations omitted). When faced with a factual dispute regarding whether an agency's decision was arbitrary and capricious, the court's "inquiry must 'be searching and careful,' but 'the ultimate standard of review is a narrow one.'" *Marsh v. Oregon Natural Resources Council, et al.,* 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989) (internal quotations omitted).

### B. Analysis

Plaintiffs argue that Secretary Lujan's ROD was an "exhaustion of agency discretion" which bound his successor to issue the patent because when Secretary Lujan issued the ROD, equitable title to the land passed to the State. Plaintiffs contend that since Secretary Lujan's ROD was final agency action, Secretary Babbitt was precluded from rescinding it. Plaintiffs also urge that Secretary Babbitt's rescission was arbitrary and capricious because it was based upon improper political considerations.

Defendants respond that Secretary Babbitt's decision was not arbitrary and capricious. Defendants contend that the ROD played dual roles. First, it was a NEPA decision document which described alternatives, described the effects of agency action and described the steps taken to mitigate harm. According to defendants, the ROD did not leave Secretary Babbitt to perform a ministerial role because the details had yet to be filled in. Defendants note that the ROD did not mention a purchase price, and since it described contingencies, discretion to implement the ROD remained. The second role the ROD played, according to defendants, was that it was the starting point of the sale under the FLPMA because the ROD contained the required finding under the FLPMA that the sale would be in the public interest. *See infra* Part II.C.

Secretary Babbitt's decision both rescinded Secretary Lujan's ROD and stated that additional review of the Ward Valley sale would be conducted. As to the rescission of Secretary Lujan's ROD, the Court agrees with the parties that Secretary Babbitt's decision rescinding Secretary Lujan's ROD was final agency action. Furthermore, as the parties agreed at the motions hearing in this case, the decision this Court is reviewing is Secretary Babbitt's decision to rescind Secretary Lujan's ROD.

The Court thus considers whether Secretary Babbitt's declaration stated a discernable and reasoned basis for his decision. Secretary Babbitt stated that his decision was based on "reviewing the Record of Decision and the circumstances surrounding the issuance of that document." Defs.' Ex. 40 ¶ 4. The Court must determine whether the "circumstances surrounding the issuance of that document" are discernable, given the facts that were

before the Secretary at the time of his decision. *Id.*

Without speculating as to what factors Secretary Babbitt might have considered, the Court considers two factors that Secretary Babbitt referred to in his decision to rescind. First, Secretary Babbitt was aware of the TRO issued by Judge Patel, and mentioned this fact in his declaration. *Id.* ¶ 2. Second, Secretary Babbitt specifically stated that he was "restoring to the *status quo ante* as of December 28, 1992, the date of the close of the public comment period on the Supplemental Environmental Impact Statement" on the disposition of the Ward Valley Lands, *id.* ¶ 4, indicating that his rescission intended to reverse Secretary Lujan's decision to convert the SEIS to an EA.

### 1. Judge Patel's Temporary Restraining Order

In her January 8, 1993 TRO, Judge Patel ordered that Secretary Lujan is "hereby temporarily restrained from transferring any BLM land in the Ward Valley until the court rules on Plaintiff's motion for a preliminary injunction". *Desert Tortoise v. Lujan,* No. 93–0114 (N.D.Cal. Jan. 8, 1993) (order granting TRO). Then at the January 19, 1993 morning hearing, Judge Patel extended the TRO using language indicating that she was concerned about not being able to undo a transfer should it occur. At some point that same day, Secretary Lujan signed the ROD. Then, in a written order entered at 6:25 p.m. in California, or 9:25 p.m. Washington time, Judge Patel ordered that the Secretary was "TEMPORARILY RESTRAINED AND ENJOINED, ..., from executing any document or taking any other action, including but not limited to signing any patent." *Desert Tortoise,* No. 93–0114, at 1–2 (N.D.Cal. Jan. 19, 1993) (order extending TRO). It is clear that these were the circumstances Secretary Babbitt referred to in his statement.

Plaintiffs contend that when Secretary Lujan signed the ROD on January 19, 1993, it had the effect of passing equitable, but not legal, title to the land to the State of California. Thus, plaintiffs argue that the ROD did not violate the TRO for two reasons. First, at the time Secretary Lujan signed the ROD, although Judge Patel had stated in Court that she was extending the January 8 TRO, she had not yet entered the written order specifically stating what actions the TRO enjoined. Second, since the ROD only passed equitable title, it did not violate the TRO. Plaintiffs, in their mandamus argument *infra,* contend that the passing of equitable title mandates that legal title be conveyed.

As to plaintiffs' first contention, while it is true that a TRO must provide fair notice of what it is enjoining, *see* Fed.R.Civ.P. 64(d); *Common Cause v. Nuclear Regulatory Comm'n,* 674 F.2d 921, 927 (D.C.Cir. 1982); plaintiffs cannot seriously contend that Secretary Lujan did not have fair notice of what he was enjoined from doing, especially in light of the AUSA's representations to Judge Patel that the Secretary had not yet signed the ROD on advice that signing the ROD might violate the TRO, and that depending upon the outcome of the hearing, the Secretary wanted to sign the ROD. The clear inference is that the Secretary's understanding of the TRO was that it would be okay to sign the ROD only if Judge Patel did not extend the TRO. Judge Patel did, however, extend the TRO. Furthermore, even under the narrow interpretation of "transfer" urged by plaintiffs, Secretary Lujan was on notice that he should not do anything regarding making a decision to convey the land. Plaintiffs protest that Judge Patel never found that her TRO had been violated is nonavailing because Secretary Babbitt settled the lawsuit in which the TRO had been entered *with the rescission of the ROD.* As to plaintiffs' second contention, the Court cannot find tenable plaintiffs' distinction between equitable and legal title given plaintiffs' position that the passing of equitable title bound Secretary Lujan's succes-

sor. If this were the case, then the ROD clearly violated the TRO.

Although at the January 19, 1993 hearing Judge Patel suggested that the federal government could go ahead with the transfer if it stipulated to waiving certain defenses, plaintiffs voiced concern, and the Judge agreed, that an important consideration was that if the transfer occurred, plaintiffs would be left with no recourse as they would not be able to sue California due to its Eleventh Amendment sovereign immunity as well as the fact that the State would not be a party to any stipulation that the federal government entered into agreeing to waive defenses. See Defs.' Ex. 34, at 31. In addition, the government represented that no such stipulation would be forthcoming from the agency. See id. at 30. From that colloquy, it is apparent that Judge Patel was concerned about a transfer, and the same concerns would apply to the transfer of equitable title as well as the transfer of legal title.

### 2. Secretary Lujan's Reversal

As late as the end of December 1992, Secretary Lujan's position was that the land transfer would not be completed before the end of the Bush Administration. Yet, within less than a month, Secretary Lujan transformed the SEIS into an EA and in the same document issued a FONSI, two days after receiving a letter from California Governor Pete Wilson suggesting that the SEIS was really an EA. This transformation cut off the public comment period on the final SEIS. When Secretary Lujan issued the ROD in the waning hours of his last day in office, only six of the approximately 200 comments received protesting the direct sale had been addressed.

■ Secretary Babbitt's declaration states a discernible and reasonable basis for his decision to rescind the ROD. First, Secretary Babbitt was aware that at the time his predecessor was under a TRO to refrain from taking any action to transfer the land, Secretary Lujan, nevertheless, signed an ROD announcing his decision to allow the land to be conveyed by direct sale. Plaintiffs now contend that the ROD irrevocably committed the Secretary to transfer the land. It is clear, however, that Secretary Lujan's issuance of the ROD was in violation of the TRO at least because, as the AUSA stated at the TRO hearing, signing the ROD was a "step towards accomplishing the transfer." Moreover, Secretary Lujan's ROD had spawned three lawsuits.

Further, when Secretary Lujan reversed his earlier position that the transfer would not be completed before the end of the Bush Administration, and transformed the final SEIS into an EA, he removed the issue from public comment in the middle of the public comment period. In addition, CDHS, one of the plaintiffs here, had actually requested that BLM delay completion of the NEPA process to allow it to more fully respond to the voluminous public comments it had received regarding the draft SEIS. The procedural status of the final SEIS is unclear in any event given that BLM published the final SEIS only two days after the close of the public comment period on the draft SEIS. Finally, at the time Secretary Lujan made his decision, he only addressed six of the approximately 200 protests received in response to the NORA. Secretary Babbitt's decision merely restored the status quo ante to the date of the close of the public comment period on the SEIS. Under these circumstances, the Court cannot say that Secretary Babbitt's decision was arbitrary and capricious. Given the myriad compelling reasons why Secretary Babbitt's recission was not arbitrary and capricious, the Court need not even reach the question of Secretary Lujan's legal authority to redesignate the SEIS an EA in an effort to circumvent a public comment period.

### C. Plaintiffs' Mandamus Claim

■ Plaintiffs contend that when Secretary Lujan signed the ROD on January 19, 1993, it had the effect of transferring equitable title to the land to the State of

California. Although, they argue, the FLPMA entrusts the Secretary with discretion regarding the transfer of lands, once that discretion has been fully exercised in a final agency action—which plaintiffs allege here is the ROD—the Secretary's discretion has ended and transferring the patent becomes a ministerial act. Therefore, plaintiffs contend, they are entitled to mandamus relief unless there is illegality or fraud.

Defendants respond that the ROD was the starting point, not the ending point, of a sale under FLPMA. First, defendants argue that under FLPMA, sale of land is within the discretion of the Secretary, and FLPMA imposes no duty to transfer land to a willing buyer, even if the transfer is in the public interest. Since a sale is not mandated, there is no entitlement that would compel mandamus relief. Second, once the finding is made that a transfer would be in the public interest, various regulations must be complied with before the sale is finalized.

 "The necessary prerequisites for this court to exercise its mandamus jurisdiction are that '(1) the plaintiff has a clear right to relief; (2) the defendant has a clear duty to act; and (3) there is no other adequate remedy available to the plaintiff.'" *Swan v. Clinton*, 100 F.3d 973, 976 n. 1 (D.C.Cir.1996) (internal citations omitted). Whether the defendant has a clear duty to act depends upon whether the duty is discretionary or ministerial. Since "[a] ministerial duty is one that admits of no discretion, so that the official in question has no authority to determine whether to perform the duty," the defendant has a clear duty to act if the duty is ministerial. *Id.* at 977. Conversely, "a duty is discretionary if it involves judgment, planning or policy decisions." *Id.* (internal citations omitted). Since the statute does not require that mandamus be issued even if the prerequisites are satisfied, the decision to grant mandamus relief lies within the sound discretion of the court. *See Nat'l*

*Wildlife Fed'n v. United States*, 626 F.2d 917, 923 (D.C.Cir.1980).

Whether the decision announced in the ROD bound Babbitt such that he had a clear duty to deliver the patent depends upon the statutory authority under which Lujan approved the direct sale of the land. The FLPMA provides in pertinent part:

A tract of public lands ... *may* be sold under this Act where ... the Secretary determines that the sale of such tract meets the following disposal criteria:

. . .

(3) disposal of such tract will serve important public objectives.

43 U.S.C. § 1713(a)(3) (emphasis supplied). Regulations implementing the FLPMA set out the procedures for the sale of land once the requisite finding under the FLPMA has been made. *See* 43 C.F.R. § 2710 *et seq.*

This statutory language and these regulations make clear that the ROD neither gave plaintiffs a clear right to the patent, nor required Babbitt to deliver the patent. First, the ROD announced a decision regarding the *manner* in which the land would be conveyed. In addition to announcing that his decision to convey the land by direct sale would result in no adverse environmental consequences, Secretary Lujan also made the finding under FLPMA that the sale of the land would serve important public objectives. Under the FLPMA, there is no requirement that once this finding is made, the Secretary is required to proceed with the sale. Rather, the statute states that a "tract of public lands ... *may* be sold under this Act where ... the Secretary determines that the sale of such tract will serve important public objectives." 43 U.S.C. § 1713(a)(3) (emphasis supplied). Therefore, neither Secretary Lujan nor Secretary Babbitt's discretion to proceed with the direct sale of the land ended with the issuance of the ROD. Accordingly, plaintiffs are not entitled to mandamus relief.

At the motions hearing and in supplemental documents filed with this Court, defendants have asserted another basis for relief. Defendants claim that CDHS is legally precluded from receiving title to the land. In view of the Court's decision that plaintiffs are not entitled to mandamus relief, however, it is not necessary for the Court to reach the issue whether or not CDHS has authority to acquire the Ward Valley land.

### III. CONCLUSION

Upon consideration of the pending motions, responses and replies, it is hereby

**ORDERED** that defendants' Motion for Summary Judgment [55–1] and intervenor-defendants' Motion for Summary Judgment [73–1], [57–1] are **GRANTED**; and it is further

**ORDERED** that plaintiff California Department of Health Service's Motion for Partial Summary Judgment [56–1] is **DENIED**; and it is further

**ORDERED** that plaintiff U.S. Ecology's Motion for Partial Summary Judgment [58–1], [42–1], [44–1] is **DENIED**; and it is further

**ORDERED** that Fort Mojave Indian Tribe's Motion to Intervene [121–1], [99–1] is **DENIED** as **MOOT**; and it is further

**ORDERED** that Fort Mojave Indian Tribe's Motion to Dismiss [121–2], [99–2] is **DENIED** as **MOOT**; and it is

**FURTHER ORDERED** that Fort Mojave Indian Tribe's Motion Roger Lane Carrick to appear *pro hac vice* [123–1], [101–1] is **DENIED** as **MOOT**; and it is

**FURTHER ORDERED** that defendant Garamendi's motion for expedited consideration [97–2] is **DENIED** as **MOOT**.