[No. D036933. Fourth Dist., Div. One. Sept. 5, 2001.]

US ECOLOGY, INC., Plaintiff and Appellant, v.
THE STATE OF CALIFORNIA et al., Defendants and Respondents;
COMMITTEE TO BRIDGE THE GAP et al., Movants and Respondents.

## COUNSEL

Latham & Watkins, Karl S. Lytz, Darius Ogloza, Kristen M. Cain and Ellen Brown for Plaintiff and Appellant.

Bill Lockyer, Attorney General, Charlton G. Holland III, Assistant Attorney General, Frank S. Furtek and Paul Reynaga, Deputy Attorneys General, for Defendants and Respondents.

California Environmental Law Project and Laurens H. Silver for Movants and Respondents.

## OPINION

**HALLER, Acting P. J.**—This action arises from "one of our Nation's newest problems of public policy": the question of where to dispose of low-level radioactive waste (LLRW). (*New York v. United States* (1992) 505 U.S. 144, 149 [112 S.Ct. 2408, 2414, 120 L.Ed.2d 120].) In 1985, the State Department of Health Services (Department) selected plaintiff US Ecology, Inc. (Ecology) to develop and operate California's first LLRW storage facility. Ecology and state officials thereafter identified a location for the facility, known as Ward Valley, and completed favorable environmental reviews for that site. But the facility has yet to be built.

Ecology places the blame on the state's failure to acquire the Ward Valley site from the federal government. Claiming that it spent millions of dollars in development costs in reliance on the state's promise to use its best efforts to acquire the Ward Valley site, Ecology sued the state, the Department, the Department's director, Diana M. Bonta´, and Governor Gray Davis, alleging breach of contract and promissory estoppel causes of action, and seeking a writ of mandate directing the state to take the necessary steps to acquire the Ward Valley site. The trial court sustained defendants' demurrer without leave to amend. We conclude Ecology has alleged a promissory estoppel claim, and reverse the judgment as to that cause of action and the related declaratory relief claim. We affirm the judgment in all other respects.[1]

FACTS

█ Because this appeal follows the sustaining of a demurrer, we draw our facts from those pleaded in the complaint and those of which we may take judicial notice. (*Moore v. Conliffe* (1994) 7 Cal.4th 634, 638 [29 Cal.Rptr.2d 152, 871 P.2d 204].) We additionally rely on several federal and state court decisions that have extensively discussed the factual and legal background relating to the present dispute. (See *Fort Mojave Indian Tribe v. Department of Health Services* (1995) 38 Cal.App.4th 1574 [45 Cal.Rptr.2d 822]; *California Radioactive Materials Management Forum v. Department of Health Services* (1993) 15 Cal.App.4th 841 [19 Cal.Rptr.2d 357], disapproved on other grounds in *Carmel Valley Fire Protection Dist. v. State of California* (2001) 25 Cal.4th 287, 305, fn. 5 [105 Cal.Rptr.2d 636, 20 P.3d 533]; *US Ecology, Inc. v. U.S. Dept. of Interior* (D.C. Cir. 2000) 231 F.3d 20; *California Dept. of Health Services v. Babbitt* (D.D.C. 1999) 46 F.Supp.2d 13.)

Our society increasingly generates LLRW from numerous sources, including hospitals, research institutions, and consumer industries. (*New York v. United States, supra,* 505 U.S. at p. 149 [112 S.Ct. at p. 2414].) Because this waste "must be isolated from humans for long periods of time, often for hundreds of years," most states would understandably prefer that a storage facility be placed outside their geographic borders. (*Id.* at pp. 149-150 [112 S.Ct. at pp. 2414-2415].) In the late 1970's, there were only three LLRW storage facilities in the country (Washington, Nevada and South Carolina) and those facilities were in the process of closing or were threatening to close. (*Id.* at p. 150 [112 S.Ct. at pp. 2414-2415].)

---

[1]The court permitted Committee to Bridge the Gap, Los Angeles Chapter of Physicians for Social Responsibility, and the Southern California Federation of Scientists to intervene in the action. Ecology challenges this order on appeal. We remand with directions to reconsider whether these organizations continue to have a direct interest in the narrowed litigation.

In 1980, the United States Congress responded to this crisis by enacting the Low-Level Radioactive Waste Policy Act, authorizing states to enter into regional compacts that may restrict their disposal facilities to waste generated within member states. (Pub.L. No. 96-573, § 2 (Dec. 22, 1980) 94 Stat. 3347; 42 U.S.C. § 2021b et seq.; *New York v. United States, supra,* 505 U.S. at pp. 150-151 [112 S.Ct. at pp. 2414-2415].) By 1985, only three approved regional compacts had operational disposal facilities, leaving the 31 states that had not entered into one of these compacts with no assured outlet for their LLRW. (*New York v. United States, supra,* 505 U.S. at p. 151 [112 S.Ct. at p. 2415].) To deal with this problem, Congress enacted supplemental legislation requiring the three existing disposal sites to continue accepting out-of-state LLRW through 1992, but permitting approved regional compacts to exclude the waste generated outside each region after 1992. (*Ibid.*)

In 1982, the California Legislature first responded to the federal mandate by enacting urgency legislation directing the Department to develop an LLRW management plan that would include plans for short-term storage, the establishment of siting criteria, and the reduction of the amount and toxicity of waste produced. (Stats. 1982, ch. 95 § 3, pp. 307-309; see Health & Saf. Code, § 115005.)[2] The legislation authorized the Department to establish and operate, or contract for the establishment and operation of, interim LLRW storage facilities. (Stats. 1982, ch. 95, § 3, pp. 307-309.)

The next year, the Legislature added to the statutory scheme by addressing long-term storage needs. This new legislation required the Department to first promulgate regulations for the selection of a private company that would serve as a licensed LLRW operator. (§ 115010.) Within three months of the adoption of those regulations, interested parties must file a "statement of capabilities and notice of intention to file an application for a license to receive radioactive materials . . . ." (§ 115020, subd. (a).) Within 45 days, the Department's director was required to select one of the applicants to serve as a license-designee. (§ 115020, subd. (b).) If there were no qualified applicants, the State Resources Agency was required to directly assume the costs and responsibility for establishing and operating the state's LLRW disposal facility. (§ 115025.) If the Department selected a license-designee, the Department was authorized to charge an annual fee and to require the applicant to "post a bond of up to one million dollars . . . to guarantee that the person will carry out the activities connected with completing the license application and obtaining the license." (§ 115020, subd. (f).) By enacting this legislation, the Legislature sought to assure the safe management of LLRW and "permit and encourage the expeditious establishment and operation by the private sector of a [LLRW disposal facility] . . . ." (Stats. 1983, ch. 1177, § 1, p. 4471.)

---

[2]All further statutory references are to the Health and Safety Code unless otherwise specified.

In April 1984, the Department promulgated the required regulations. (Cal. Code Regs., tit. 17, § 30470 et seq.) In 1985, the Department selected Ecology as the license-designee. Ecology formally accepted the designation in December 1985, and agreed to be responsible for developing the LLRW facility under the Department's oversight. (*California Dept. of Health Services v. Babbitt, supra*, 46 F.Supp.2d at p. 16.) Ecology thereafter posted the required $1 million in securities to guarantee performance of its duties, and agreed to pay the required annual fee of $250,000. (Cal. Code Regs., tit. 17, § 30485.) Ecology paid that fee each year between 1985 and 1999. The Department used these fees to perform supporting technical studies and to monitor expenses incurred by Ecology.

In 1987, California entered into a regional compact with Arizona, North Dakota, and South Dakota for the construction and operation of an LLRW disposal facility (Southwestern Compact). (*Fort Mojave Indian Tribe v. Department of Health Services, supra*, 38 Cal.App.4th at pp. 1582-1583.) The California Legislature and the United States Congress ratified this compact; the terms of the compact are part of the Health and Safety Code. (§§ 115250, 115255; 42 U.S.C. § 2021d(a)(2).) The Southwestern Compact obligates the "host state" to "[c]ause a regional disposal facility to be developed on a timely basis [and] [¶] [e]nsure . . . the protection and preservation of public health and safety in the siting, design, development, licensing, . . . and long-term care" of the facility. (§ 115255, art. 4, subd. (E)(1) & (2).) California agreed to be the host state for the first 30 years of the Southwestern Compact's existence. (§ 115255, art. 4, subd. (C)(1).)

Ecology thereafter engaged in an "intensive and costly" search for an environmentally suitable LLRW disposal facility site. By March 1988, Ecology had identified two sites. The primary site was located on federally owned land in the Mojave desert known as Ward Valley. The secondary site was also located on federally owned land known as Silurian Valley. The Department, which was extensively involved in the site selection process, concurred in the designation of both sites. (See *California Radioactive Materials Management Forum v. Department of Health Services, supra*, 15 Cal.App.4th at p. 853.) Because state law requires the facility to be located on either federal or state land, and federal policy requires the facility to be on state-owned land, the California State Lands Commission (Lands Commission) submitted an application to the federal government, seeking to preserve the Ward Valley and/or Silurian Valley sites for the state's acquisition.

Ecology then began collecting detailed environmental information about the Ward Valley site for the license application and related environmental

studies under the California Environmental Quality Act and the National Environmental Protection Act. Ecology entered into contracts with the state and federal governments agreeing to reimburse governmental agencies for costs associated with preparation of the environmental impact report (EIR), environmental impact statement (EIS), and site acquisition documents.

In August 1988, the Department and Ecology executed a memorandum of understanding (MOU) pertaining to their relationship. As will be detailed in the discussion section below, the MOU recorded certain "mutual understandings" regarding each party's obligations concerning the development of the LLRW disposal facility and Ecology's ultimate recovery of its costs. Of particular relevance, the Department agreed "the State will use its best efforts to assure the timely transfer of the relevant site from the federal government to the State so as not to delay the issuance of the license pursuant to the proposed schedule of Facility development milestones contained in Exhibit C."[3] Consistent with applicable regulations, the Department also agreed Ecology would be entitled to recover all of its development costs through the rates charged to customers when the facility was in operation. (See Cal. Code Regs., tit. 17, § 30495.)

Induced by the Department's promises and assurances contained in the MOU, in September 1989 Ecology submitted to the Department an 11-volume, 7,000-page project application, including extensive environmental data and analysis and safety evaluations respecting the Ward Valley site.

In April 1991, the Department and the Bureau of Land Management (BLM) issued a final joint EIR/EIS. (See *California Dept. of Health Services v. Babbitt, supra*, 46 F.Supp.2d at p. 16; *Fort Mojave Indian Tribe v. Department of Health Services, supra*, 38 Cal.App.4th at p. 1584.) The report concluded the Ward Valley site was the preferred location for the LLRW storage facility, and the facility would result in no significant adverse environmental impacts. (*California Dept. of Health Services v. Babbitt, supra*, 46 F.Supp.2d at pp. 16-17.)

In July 1991, the Department issued a draft license to Ecology for public review. (§ 115145, subd. (a).)

About this same time, Governor Davis, who was then a member of the Lands Commission, began to publicly oppose California's efforts to establish a regional LLRW disposal facility within its territory and/or the Ward

---

[3]Exhibit C was the schedule originally proposed by Ecology in its license application, and projected the Department would approve Ecology's license in late 1990, and Ecology would begin disposal operations by spring 1991.

Valley LLRW disposal facility. Ecology alleges that "because of Respondent Davis'[s] opposition to the establishment of a LLRW disposal facility within California," the Lands Commission withdrew its application to acquire the Ward Valley site.

In July 1992, the Department filed an application with the BLM to purchase the Ward Valley site through an alternate method—under the federal Land Policy Management Act's direct sale provisions. (43 U.S.C. § 1713(a)(3).)

In January 1993, then United States Interior Secretary Manuel Lujan announced his intent to issue a record of decision approving the Department's application for direct sale of the Ward Valley site to California. (*California Dept. of Health Services v. Babbitt, supra,* 46 F.Supp.2d at p. 18.) Opponents of the Ward Valley LLRW immediately filed a federal district court action seeking a declaration that the proposed transfer was invalid because it violated the Endangered Species Act. (*Ibid.*) The district court granted a temporary restraining order, enjoined the Secretary from transferring any Ward Valley land, and scheduled a hearing on the preliminary injunction. (*Ibid.*)

Secretary Lujan thereafter issued the record of decision approving the direct sale of the Ward Valley site to California. (*California Dept. of Health Services v. Babbitt, supra,* 46 F.Supp.2d at p. 19.) Two additional groups of plaintiffs then filed lawsuits seeking to prevent the proposed sale and development of the Ward Valley site. (*Ibid.*) Shortly thereafter, the Clinton administration took office. In February 1993, newly appointed Interior Secretary Bruce Babbitt rescinded former Secretary Lujan's record of decision, and withdrew approval of the sale of the Ward Valley site to California. (*Ibid.*)

Nine months later, in September 1993, the Department licensed the Ward Valley LLRW disposal facility, certified the project's final EIR, and issued Ecology a license to operate the facility. (See *Fort Mojave Indian Tribe v. Department of Health Services, supra,* 38 Cal.App.4th at pp. 1585-1586.)

In October 1995, a California Court of Appeal rejected legal challenges filed by project opponents to the Ward Valley license and to the adequacy of the related EIR and EIS. (See *Fort Mojave Indian Tribe v. Department of Health Services, supra,* 38 Cal.App.4th at pp. 1598-1608.)

In January 1997, the Department petitioned for a writ of mandate in federal district court asking the court to compel Secretary Babbitt to perform

his alleged ministerial duty to convey the Ward Valley site to California, and alleging that Secretary Babbitt's reversal of former Secretary Lujan's record of decision was arbitrary and capricious under the federal Administrative Procedures Act (the *Babbitt* action). (*California Dept. of Health Services v. Babbitt, supra,* 46 F.Supp.2d at p. 20.) Three weeks later, Ecology filed an action asserting substantially similar claims. The federal court consolidated the two cases. (*Ibid.*) The court later granted summary judgment in favor of Secretary Babbitt, determining that Babbitt had a "discernible and reasonable basis" for his decision to rescind former Secretary Lujan's record of decision. (*Id.* at p. 24.)

In January 1999, Governor Davis became Governor of California. Ecology alleges that Governor Davis entered office "with a design to repudiate the State's commitment to establish the Ward Valley LLRW disposal facility, to shun [Ecology] and to abrogate the State's legal duty to cause the timely establishment of a regional LLRW disposal facility with[in] its territory."

In May 1999, Ecology filed a notice of appeal in the *Babbitt* action. Ecology requested that the Department also appeal the decision, but the Department refused to appeal.[4]

The next month, Governor Davis appointed Richard C. Atkinson, president of the University of California system, to chair an advisory group charged with proposing solutions to the state's LLRW disposal problems and alternatives to the Ward Valley LLRW disposal facility (the Atkinson Group). Ecology alleges "the Atkinson Group was specifically instructed by Governor Davis or by his senior staff not to consider the Ward Valley Site, or any other specific disposal site, as a solution for California's LLRW disposal problems" and that the Atkinson Group "will be used by the Davis administration as a pretext for not complying with its statutory and contractual obligations to establish the Ward Valley LLRW disposal facility."

In November 1999, the BLM denied the state's direct sale application to purchase the Ward Valley site. BLM's denial was allegedly based "in material part" on BLM's determination that California no longer intended to establish the Ward Valley LLRW disposal facility, and BLM's denial was without prejudice to submit another application to purchase the Ward Valley site.

In November 1999 through January 2000, Governor Davis and California's Resources Agency Secretary allegedly made statements in news media

---

[4]The United States Court of Appeals later dismissed Ecology's appeal, concluding Ecology had no standing on its own and could not base its standing on the Department's status because the Department did not also appeal. (*US Ecology, Inc. v. U.S. Dept. of Interior, supra,* 231 F.3d at pp. 24-26.)

interviews that the Ward Valley project was a "dead issue" and that the state "intended to continue shipping at least 90% of the LLRW generated within California to locations outside of the state." Governor Davis did not propose any appropriations for the LLRW disposal program in the 2000-2001 state budget, and all department personnel previously assigned to the program have been reassigned.

Ecology alleges that it satisfactorily completed its duties as the state's license-designee and satisfactorily performed its duties as the state's licensee. Ecology further alleges it has incurred more than $162 million in development costs, including interest on project loans and lost profits, in connection with the Ward Valley LLRW disposal facility.

Based on the foregoing alleged facts, Ecology asserted five causes of action: (1) breach of an express written contract; (2) breach of an implied in fact contract; (3) promissory estoppel; (4) writ of mandate requesting the court to direct Governor Davis and Director Bonta' to "take such action as is reasonably calculated to cause the establishment of the Ward Valley LLRW disposal facility on a timely basis"; and (5) declaratory relief. Defendants filed a demurrer as to each cause of action. The court sustained the demurrer without leave to amend.

DISCUSSION

I. <i>Standard of Review</i>

In reviewing a judgment after a demurrer is sustained without leave to amend, we review the pleading de novo and must assume the truth of all facts properly pleaded by the plaintiff. We disregard allegations that are contrary to the law or to a fact that may be judicially noticed, or that are contradicted by the express terms of an exhibit incorporated in the complaint. (*Freeman v. San Diego Assn. of Realtors* (1999) 77 Cal.App.4th 171, 178, fn. 3 [91 Cal.Rptr.2d 534].) Regardless of the label attached to the cause of action, we must examine the complaint's factual allegations to determine whether they state a cause of action. (*Cochran v. Cochran* (1997) 56 Cal.App.4th 1115, 1119 [66 Cal.Rptr.2d 337].) We must reverse if the alleged facts show entitlement to relief under any possible legal theory. (*Id.* at p. 1120.)

We apply these principles to determine whether Ecology has stated a cause of action on theories of (1) breach of express or implied contract; (2) promissory estoppel; and (3) failure to perform a ministerial duty.

## II. *Breach of Express and Implied Contract Causes of Action*

### A. *The MOU*

Ecology's breach of express and implied contract claims are based primarily on the August 1988 MOU, which is attached to Ecology's complaint and was signed by Ecology's president and the Department's LLRW program manager.

The MOU initially describes the history of Ecology's license-designee's role and then states "The State and Ecology have each undertaken a number of actions and Ecology has incurred considerable expense to date in connection with the development of the [LLRW] Facility. A number of rights and obligations exist between the State and Ecology. Recognizing this as well as Ecology's need to obtain certain written assurances from the State in order to obtain financing, the California Legislature recently directed the [Department] to enter into appropriate written agreements with Ecology in order to reduce the cost of project financing and to further expedite attainment of the goals established under Senate Bill 342. This Memorandum responds to that directive by recording certain mutual understandings between Ecology and the State concerning the development of the Facility and the repayment of debt obligations incurred for the development of the Facility. This Memorandum is not, however, intended as a complete statement of all rights, obligations or agreements which may exist between Ecology and the State, except as to the specific matters contained herein."

The MOU then sets forth each party's agreements with respect to the LLRW disposal facility.

Ecology agreed to "maintain the promised schedule as set forth in its 1984 Application, as amended from time to time with approval of the [Department]" and agreed that its "failure to maintain the promised schedule may result in forfeiture of the securities posted in lieu of the performance bond, unless the failure is the result of an Act of God or a departmentally caused delay, or unless Ecology can provide assurance that any delay will be remedied without jeopardizing the overall project schedule."

The Department made numerous promises.

First, the Department agreed that Ecology would be the sole LLRW facility operator in the state, stating "[a]ssuming satisfactory completion of its duties as license designee . . . Ecology will become the LLRW disposal facility licensee in the State, and will, assuming satisfactory performance of

its duties as licensee, remain the sole LLRW disposal facility licensee in the State for the duration of the period of operation of the Facility."

Second, the Department agreed the state would use its "best efforts" to maintain the schedule as set forth in exhibit C, and would "use its best efforts to assure the timely transfer of the relevant site from the federal government to the State so as not to delay the issuance of the license pursuant to the proposed schedule of Facility development milestones contained in Exhibit C. Title to the Facility's site will be held by the State."

Third, the Department agreed to enter into a ground lease, "pursuant to which Ecology will receive an exclusive leasehold interest in the site that authorizes it to conduct low-level radioactive waste disposal operations there pursuant to the conditions and requirements of the license."

Fourth, the Department agreed the "rate schedule" would permit Ecology to recover all "reasonable costs" incurred in developing and operating the facility, "including the costs of all reasonable activities of Ecology in its capacity as license designee . . . *plus the return factor specified by Ecology in its 1984 Application to the [Department]*." The MOU states that "The rate schedule is intended to provide the mechanism for recovery of costs including any debt obligations properly incurred in relationship to development of the Facility" and that "Ecology will be entitled to recover such costs through the rate schedule whether or not it continues to be license designee or licensee."

 Ecology alleges defendants breached and/or repudiated these express promises. Specifically, Ecology alleges defendants violated the MOU by (1) "advanc[ing] a scientifically baseless and pretextual refusal to pursue establishment of the Ward Valley LLRW disposal facility . . . ."; (2) abandoning "the State's efforts to establish a regional LLRW disposal facility within California"; (3) "refus[ing] to support . . . Ecology's efforts to compel the United States to transfer the Ward Valley site to the State of California"; and (4) "refus[ing] to deal with Ecology . . . ."

B. *The MOU Was Not Supported by Adequate Consideration*

Defendants maintain the MOU cannot be the basis for a breach of express or implied contract claim because it lacks consideration, contending the MOU "adds nothing" to Ecology's statutory obligations as a license-designee and licensee. We agree.

 A promise is not enforceable unless consideration was given in exchange for the promise. (*Passante v. McWilliam* (1997) 53 Cal.App.4th

1240, 1247 [62 Cal.Rptr.2d 298].) A promise to perform a preexisting legal duty is not supported by consideration. (*Bailey v. Breetwor* (1962) 206 Cal.App.2d 287, 291-292 [23 Cal.Rptr. 740].)

Ecology made a single promise in the MOU that it would maintain the promised schedule set forth in its license-designee application and, if it did not, it would be subject to forfeiture of its performance bond. However, Ecology was already bound to perform these obligations on this same schedule or forfeit its performance bonds. (Cal. Code Regs., tit. 17, § 30483.) The MOU language was identical to the governing regulations that provide: "The performance bond . . . shall be forfeited upon [¶] . . . [¶] [f]ailure to maintain the promised schedule and such failure is not the result of an act of God or Departmentally caused delay and the license designee cannot provide assurance that this delay will be remedied without jeopardizing the overall project schedule." (Cal. Code Regs., tit. 17, § 30483.)

Ecology argues that its promise was supported by consideration because it agreed "to continue paying its annual $250,000 license fee to perform as the State's licensee *beyond the term of its performance guarantee.*" (Italics added.) However, Ecology never made this promise in the MOU, nor was this promise alleged in the complaint. We similarly reject Ecology's argument that its promise "not to exercise its right to withdraw from the development project" constituted "fresh consideration" to show the MOU is an enforceable contract. The MOU does not contain Ecology's promise that it would not withdraw from the project. Rather, the MOU merely reaffirms the governing regulations that if Ecology withdraws from the project without a justifiable excuse it would forfeit its $1 million securities guarantee.

Ecology additionally argues there was consideration for its promises because the MOU should be viewed as "memorializing" the contract that arose when Department selected Ecology as the license-designee. This argument fails because the initial license relationship between Department and Ecology did not create contractual duties. A license merely permits an entity to pursue a regulated activity, and "has none of the elements of a contract." (*Rosenblatt v. Cal. St. Bd. of Pharmacy* (1945) 69 Cal.App.2d 69, 74 [158 P.2d 199]; see *Mountain Medical, Inc. v. City of Colorado Springs* (1980) 43 Colo.App. 391 [608 P.2d 821, 823].) In selecting Ecology as a license-designee, the Department granted Ecology permission to pursue the development of an LLRW, but it made no express or implied promises regarding its own role in the siting process. For similar reasons, we reject Ecology's argument that when it received the license it was provided with a franchise that gave rise to contractual and property rights or that a "public works" contract was created. Under the statutory scheme, Ecology's status as a

license-designee did not give rise to any enforceable contractual or property rights on behalf of Ecology, and Ecology's attempts to recharacterize the relationship as a franchise or a public works contract are unavailing.

To the extent Ecology alternatively seeks to base its breach of contract actions on a June 1988 letter received from the Department's program manager, Don Womeldorf, this letter is not actionable. The MOU contained an integration clause with respect to *"the specific matters contained herein."* (Italics added.) Because Womeldorf's statements concern the same matters addressed in the MOU, they cannot add to or modify the later agreement. (See *Chaknova v. Wilbur-Ellis Co.* (1999) 69 Cal.App.4th 962, 968 [81 Cal.Rptr.2d 871].)

We additionally reject Ecology's argument that the trial court abused its discretion in refusing to permit it to amend the complaint to state a breach of contract based on a September 1993 lease agreement between Ecology and the Department. Ecology submitted a copy of this lease with its opposition to the demurrer. A condition precedent to the enforceability of the lease is that the "State shall have acquired, and shall be holding, fee simple absolute title to the [Ward Valley site]." Ecology admits this condition was never satisfied.

We conclude the absence of consideration establishes that Ecology cannot state a breach of an express or implied contract cause of action based on the MOU, and that Ecology has failed to state a contract cause of action based on any other alleged oral or written agreement.

### III. *Promissory Estoppel*

The lack of consideration to support the promises made in the MOU is not fatal to Ecology's promissory estoppel claim. As our Supreme Court recently stated, "[p]romissory estoppel is 'a doctrine which employs equitable principles to satisfy the requirement that consideration must be given in exchange for the promise sought to be enforced.' [Citation.]" (*Kajima/Ray Wilson v. Los Angeles County Metropolitan Transportation Authority* (2000) 23 Cal.4th 305, 310 [96 Cal.Rptr.2d 747, 1 P.3d 63] (*Kajima/Ray Wilson*).) "Promissory estoppel was developed to do rough justice when a party lacking contractual protection relied on another's promise to its detriment." (*Id.* at p. 315.) " 'A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise . . . .' [Citations.]" (*Id.* at p. 310.)

These principles apply to claims against the government, particularly where the application of the doctrine would further public policies and prevent injustice. (See *Kajima/Ray Wilson, supra,* 23 Cal.4th 305; *Hilltop Properties v. State of California* (1965) 233 Cal.App.2d 349 [43 Cal.Rptr. 605, 37 A.L.R.3d 109].) In *Kajima/Ray Wilson,* a contractor which was the low bidder on a project proved at trial that the city wrongfully failed to award it the contract. (*Kajima/Ray Wilson, supra,* 23 Cal.4th at pp. 309-310.) The California Supreme Court held that although the contractor could not state a breach of contract action against the city, it was entitled to recover bid preparation costs under a promissory estoppel theory. (*Id.* at pp. 313-321.) The court noted that the city represented that it would award the contract to the lowest responsible bidder, the contractor relied on this representation, and the city thereafter violated its promise. (*Id.* at p. 315; see also *Hilltop Properties v. State of California, supra,* 233 Cal.App.2d 349 [holding plaintiff stated a promissory estoppel cause of action against the state based on allegations that it detrimentally relied on a promise by state officials to buy certain real property].)

In this case, Ecology alleged facts that fit within the classic model of a promissory estoppel claim. These facts include the following: (1) the Department made promises in the MOU that it would use its best efforts to acquire property from the federal government for use as an LLRW disposal facility; (2) the Department should reasonably have expected these promises to induce action on the part of Ecology; (3) Ecology did in fact detrimentally rely on the promises by spending millions of dollars to develop the facility in anticipation of the federal-state land transfer; and (4) the Department violated its promises by abandoning its efforts to acquire the Ward Valley site from the federal government and there was no justifiable basis for this abandonment. These facts, if true, would support a determination that an injustice would occur if the doctrine were not applied. (See *Hilltop Properties v. State of California, supra,* 233 Cal.App.2d at pp. 364-365.)

Defendants nonetheless argue the court properly sustained their demurrer on this claim because: (1) the Department had no statutory authority to make the alleged promises; (2) enforcement of the alleged promises would be contrary to public policy; and (3) the allegations establish as a matter of law that the Department fully complied with its alleged promises. As explained below, we find each of these arguments to be without merit.

### A. *Statutory Authority*

"To be valid, administrative action must be within the scope of authority conferred by the enabling statutes. [Citation.]" (*Terhune v. Superior*

*Court* (1998) 65 Cal.App.4th 864, 872-873 [76 Cal.Rptr.2d 841].) Although the courts accord great weight to the interpretation of the scope of an enabling statute by officials charged with the statute's administration, "final responsibility for interpretation of the law rests with courts." (*Id.* at p. 873.) "If the court determines that a challenged administrative action was not authorized by or is inconsistent with acts of the Legislature, that action is void." (*Ibid.*)

These rules apply to the power of an administrative agency to enter into a legally binding contract or to make enforceable promises. (See *Air Quality Products, Inc. v. State of California* (1979) 96 Cal.App.3d 340 [157 Cal.Rptr. 791] (*Air Quality Products*).) No contractual or promissory estoppel "liability may be assessed against [a state agency]" if the contract or promises were not "statutorily or constitutionally authorized." (*Id.* at p. 350.) But the Legislature need not expressly give an agency the power to make enforceable promises. Administrative " ' "officials may exercise such additional powers as are necessary for the due and efficient administration of powers expressly granted by statute, or as *may fairly be implied* from the statute granting the powers." ' " (*Calfarm Ins. Co. v. Deukmejian* (1989) 48 Cal.3d 805, 824 [258 Cal.Rptr. 161, 771 P.2d 1247].) Thus, an administrative agency has the power to contract on a particular matter if this power may be fairly implied from the general statutory scheme. (See *Youngman v. Nevada Irrigation Dist.* (1969) 70 Cal.2d 240, 248 [74 Cal.Rptr. 398, 449 P.2d 462]; *Dickey v. Raisin Proration Zone No. 1* (1944) 24 Cal.2d 796, 810 [151 P.2d 505, 157 A.L.R. 324]; *City and County of San Francisco v. State of California* (1978) 87 Cal.App.3d 959, 965 [151 Cal.Rptr. 469].)

The relevant LLRW statutory provisions do not expressly provide the Department with the authority to make legally binding promises to the LLRW license-designee.[5] But we conclude the statutory scheme as a whole reflects that the Legislature intended to provide the Department with the authority to do so.

In seeking to establish an LLRW waste facility in California, the Legislature identified the Department as the lead agency responsible for ensuring the facility would be built and operational, and mandated that the facility be operated on government owned land. (§§ 115005, 115010, subd. (a)(1).) The Legislature directed the Department to select a qualified private entity that

---

[5]We recognize the Legislature did expressly authorize the Department to execute the MOU, but we agree with the Department this authorization is invalid because it was contained in the 1988 Budget Act. The Legislature may not constitutionally use a budget act to amend, or even clarify, a previous statute. (See *California Lab. Federation v. Occupational Safety & Health Stds. Bd.* (1992) 5 Cal.App.4th 985, 991-994 [7 Cal.Rptr.2d 399].)

would bear all of the costs and obligations of developing and operating this facility. (See §§ 115010, 115020.) Although the Legislature provided for a publicly financed option if a qualified private entity could not be found, it expressly stated its intent was to "permit and encourage" the "private sector" to establish and operate the LLRW facility. (Stats. 1983, ch. 1177, § 1, p. 4471.) Given the economic, legal, and political complexities in establishing California's first LLRW facility, and the fact that the selected entity would be required to pay substantial regulatory fees and development costs during the interim license-designee stage, the Legislature obviously understood the license-designee would bear an enormous risk, and could require some level of assurance that the government would comply with the obligations that were solely within its power to accomplish.

Because of the unique nature of the relationship between the Department and the license-designee and the fact the private entity was wholly dependent on the government's good faith in complying with its necessary obligations to recover any of the licensee's costs, it is reasonable to infer the Legislature intended to provide the Department with the authority to make binding promises to the license-designee as a necessary part of the Department's supervisory powers. The Department's obligation to supervise the private entity's development of the LLRW disposal facility necessarily implied powers to make assurances designed to reduce facility development costs, ensure a competent and financially sound private developer, and ensure the facility was timely established. The express statutory objective of the "expeditious establishment and operation by the private sector of a [LLRW] disposal facility" would be undermined if the agency charged with the responsibility for meeting this goal did not have the power to promise to use its best efforts to comply with its own obligations, particularly the obligation to acquire suitable property for the site. (See Stats. 1983, ch. 1177, § 1, p. 4471.)

In support of its arguments that the Department did not have the statutory authority to make binding promises to its license-designee, defendants rely exclusively on *Air Quality Products, supra,* 96 Cal.App.3d 340. In *Air Quality Products,* an administrative agency (the State Air Resources Board) approved an exhaust emissions control device developed by the plaintiff, but then approved a similar, but less expensive device produced by a competitor. (*Id.* at pp. 345-346.) The agency told the plaintiff that it would require installation of its device in 15 percent of 1955-1965 cars if the plaintiff met several specific requirements. (*Id.* at p. 346.) The plaintiff allegedly met each of the agency's requirements and, reasonably relying on the agency's "inducements," produced 90,000 devices at a cost of $2 million. (*Ibid.*) The agency thereafter changed its requirements and repudiated the representations made to the plaintiff, rendering the product unmarketable. (*Ibid.*) The

*Air Quality Products* court held that even if the complaint adequately alleged the elements of an implied contract or promissory estoppel, the plaintiff could not recover because the agency had no express or implied constitutional or statutory authority to enter into an enforceable contract with the plaintiff. (*Id.* at pp. 350-351.)

This case is distinguishable because in *Air Quality Products* there was no reasonable basis for finding an implied statutory authority to make the alleged promises. In that case, the alleged promise to a single manufacturer would have undermined the statutory objective of promoting competition among emission control device manufacturers. (*Air Quality Products, supra,* 96 Cal.App.3d at p. 350.) Here, the alleged promise—that the Department use its best efforts to acquire a site for Ecology's operation of an LLRW facility—is not only consistent with the applicable laws, but it is a necessary premise of ensuring the private development of an LLRW disposal facility on government owned land.

The *Air Quality Products* court's holding was also based on its view that statutory references to contracting in other portions of the statute suggested that "had the Legislature intended the Board to have the general contractual authority argued for, the statute would expressly so provide." (*Air Quality Products, supra,* 96 Cal.App.3d at p. 350.) This principle is inapplicable here. Section 115045 authorizes the Department to "establish and operate, *or contract* for the establishment and . . . operation, of one or more low-level radioactive waste *interim* storage facilities for the exclusive use of persons located in California . . . ." (Italics added.) This authority was necessary because the Legislature did not create a licensing procedure for the development of an interim LLRW storage facility. Given the difference in legislative schemes, it is not reasonable to infer the Legislature's specific provision for the Department to contract for short-term needs means that it necessarily intended to exclude this authority in the long-term context.

We reject defendants' additional argument that the fact there was a license relationship between the Department and Ecology demonstrates the Legislature did not intend to authorize the creation of additional contractual obligations between the two parties. Although the relationship between the parties was governed by a regulatory license, this does not logically or legally show the Legislature specifically intended to preclude any other form of relationship. We further reject defendants' contention that the alleged promise is "inconsistent with [the Department's] ability to carry out the provisions of the Compact, since it contractually restricts [the Department's] options in deciding where to locate a LLRW disposal site." At the time the MOU was executed, the parties were considering the Ward Valley and

Silurian Valley sites, and the Department promised to use its best efforts to assure the timely transfer of the "relevant" site. Ecology alleges the Department breached its promise to use its best efforts to locate an appropriate LLRW facility site. This promise did not bind the Department to a particular location.

We are also unpersuaded by defendants' reliance on the provisions authorizing the Department to revoke, suspend or restrict the LLRW license. (See §§ 115060, subd. (a), 115090, 115145, subd. (a).) Defendants argue the "existence of this authority" is "inconsistent" with Ecology's assertions that the Department was statutorily authorized to enter into a binding contract with Ecology. We disagree. The MOU expressly conditions Ecology's continued status as a license-designee and licensee on its "satisfactory completion of its duties as license designee" and "satisfactory performance of its duties as licensee," and reaffirms that "Nothing in this Memorandum shall be construed as abrogating or diminishing the [Department's] exercise of its delegated police powers in the licensing or other regulation of the Facility."

### B. *Public Policy Does Not Defeat the Complaint at the Pleading Stage*

■ Defendants alternatively contend the promissory estoppel cause of action "must . . . fail because it seeks to assert an estoppel against a government entity that would be contrary to public policy."

Promissory estoppel may not be " 'invoked against a governmental body where it would operate to defeat the effective operation of a policy adopted to protect the public.' [Citation.]" (*Kajima/Ray Wilson, supra,* 23 Cal.4th at p. 316.) Defendants argue that enforcing a promise to " 'take all steps necessary to acquire title to the Ward Valley Site from the United States,' regardless of any difficulties of acquiring such a site due to federal environmental and safety concerns . . . would be contrary to the State's duty to act in the public interest and would contravene its police power."

Although we agree with defendants that "contracting away the State's ability to take action to protect its citizens by way of promissory estoppel" would violate public policy, that is not what Ecology has alleged. Ecology has alleged the state failed to acquire the Ward Valley site or any other appropriate site solely because of political considerations rather than environmental or safety concerns. Assuming, as we must for purposes of a demurrer, that this allegation is true, enforcement of the state's promise would not necessarily violate public policy.

### C. *The Complaint Adequately Alleged a Violation of the MOU*

■ Defendants next contend the contract-based causes of action (including promissory estoppel) fail because the complaint does not adequately allege a violation of the MOU.

First, defendants argue the Department did not violate its promise to use its best efforts to acquire a suitable site because that promise "was limited in duration." Defendants rely on the portion of the MOU stating, "[w]hether Ward Valley or Silurian Valley is ultimately acquired, the State will use its best efforts to assure the timely transfer of the relevant site from the federal government to the State so as not to delay the issuance of the license *pursuant to the proposed schedule of Facility development milestones contained in Exhibit C.*" (Italics added.) Exhibit C states that it contains the "agreed-to project schedule . . . represent[ing] the original proposed schedule included in [Ecology's] [license] application as amended from time to time with the concurrence of [the Department and Ecology]." The schedule projects that the Ward Valley site will be transferred to California in late 1990, and Ecology would begin disposal operations in spring 1991.

The exhibit C schedule does not conclusively show Ecology cannot prove the Department breached its promise to use its best efforts to acquire an LLRW disposal facility. The timeline represents the parties' *proposed* schedule and does not state or suggest that the parties are relieved of their obligations if outside circumstances render it necessary to extend the time schedule for land transfers and operation of the facility. Further, the MOU expressly contemplates that the time line was subject to amendment "from time to time."

Defendants alternatively argue that even assuming the MOU is valid and the "best efforts" language is still applicable, the allegations show the Department did in fact use its best efforts to acquire the Ward Valley site. In support, defendants direct us to the allegations that the state unsuccessfully sued the federal government to obtain the Ward Valley site after Secretary Babbitt refused to allow its conveyance and the facts showing there was substantial public opposition to the Ward Valley location. Although these alleged facts are certainly relevant to the best efforts issue, they are insufficient to establish Department's entitlement to prevail on its best efforts argument at the pleading stage.

The question whether a defendant used its best efforts under the circumstances is generally a factual issue. (See *Gilmore v. Hoffman* (1954) 123 Cal.App.2d 313, 320 [266 P.2d 833].) Ecology alleged Department violated its promise to use its best efforts to acquire an LLRW disposal facility site by: (1) failing to object to the federal government's determination to deny transfer of the property; (2) failing to appeal the federal district court's *Babbitt* action ruling; and (3) directing the Atkinson Group "not to consider the Ward Valley Site, or any other specific disposal site, as a solution for California's LLRW disposal problems." Ecology further alleged that but for

this conduct, the federal government would have transferred the property to the state, and that the federal government is now willing to transfer suitable property to the state. Neither the pleadings nor the judicially noticed materials conclusively negate these alleged facts. On this record, the best efforts issue cannot be resolved by a demurrer.

### D. Conclusion on Promissory Estoppel Cause of Action

We conclude the complaint stated a cause of action for promissory estoppel. We emphasize, however, that this conclusion means only that Ecology has plead sufficient facts to overcome a demurrer. Ecology will still be required to prove its claims, and we offer no opinion as to the likelihood that Ecology will be able to do so. ▆▆ We note further that although Ecology seeks all of its preparation costs and alleged lost profits, the full scope of contract-based damages is not necessarily recoverable under the equitable promissory estoppel doctrine. (See *Kajima/Ray Wilson, supra*, 23 Cal.4th at pp. 315-321.)

### IV. Writ of Mandate

▆▆ In its writ petition, Ecology alleged the Southwestern Compact requires California to "cause a regional [LLRW] disposal facility to be developed on a timely basis," and that California cannot satisfy this duty "other than by ensuring that the already-licensed and judicially-approved Ward Valley LLRW disposal facility is expeditiously established." The petition further alleged "the United States Department of Interior would undertake to complete the steps needed to transfer the Ward Valley Site to California, upon the good faith request of [Governor] Davis . . . ." Ecology requested a writ of mandamus to enforce the Southwestern Compact, and direct Governor Davis and Director Bonta´ to "take such action as is reasonably calculated to cause the establishment of the Ward Valley LLRW disposal facility on a timely basis . . . ."[6]

▆▆ A writ of mandate "may be issued . . . to compel the performance of an act which the law specially enjoins . . . ." (Code Civ. Proc., § 1085,

---

[6]These actions include (1) requesting the Secretary of the Interior to withdraw the decision denying California's request to purchase the Ward Valley site; (2) requesting the Secretary of the Interior to reinstate California's application to purchase the Ward Valley site; (3) requesting the Secretary of the Interior to issue to California the land patent for 1,000 acres of federally owned land; (4) requiring a meeting between Department officials and Ecology "for the purpose of establishing an expedited timetable for the transfer of the Ward Valley Site to California"; and (5) "refrain[ing] from taking any action that is reasonably likely to be interpreted as a breach by the State of California of its covenants to 'perform the acts which are required by' the Southwestern Compact."

subd. (a).) To warrant the relief, the petitioner must demonstrate the public official or entity had a ministerial duty to perform. (*Transdyn/Cresci JV v. City and County of San Francisco* (1999) 72 Cal.App.4th 746, 752 [85 Cal.Rptr.2d 512]; see *Saathoff v. City of San Diego* (1995) 35 Cal.App.4th 697, 702 [41 Cal.Rptr.2d 352].) " 'A ministerial act is an act that a public officer is required to perform in a prescribed manner in obedience to the mandate of legal authority and without regard to his own judgment or opinion concerning such act's propriety or impropriety, when a given state of facts exists. Discretion, on the other hand, is the power conferred on public functionaries to act officially according to the dictates of their own judgment.' [Citation.]" (*Transdyn/Cresci JV v. City and County of San Francisco, supra,* 72 Cal.App.4th at p. 752.)

■■■ Ecology's petition seeks to compel the state to obtain the Ward Valley site from the federal government and establish the site as California's LLRW disposal facility. However, there is nothing in the law requiring that this site be used for an LLRW disposal facility. The Southwestern Compact merely requires that California "[c]ause a regional [LLRW] disposal facility to be developed on a timely basis," but does not state or imply that California is required to choose the Ward Valley site for that purpose. (§ 115255, art. 4, subd. (E)(1).)

Ecology argues the Department has already exercised its discretion and chosen the Ward Valley site by licensing the facility at that location. However, the applicable statutes and regulations do not provide the issuance of a license means the state is statutorily required to purchase and/or use the site as an LLRW facility. Mandamus cannot be used to compel the exercise of discretion in a particular manner or to order a specific result when the underlying decision is purely discretionary. (See *State of California v. Superior Court* (1974) 12 Cal.3d 237, 247 [115 Cal.Rptr. 497, 524 P.2d 1281].)

Ecology alternatively contends it should be given the opportunity to amend the complaint to seek an order compelling the state to establish an LLRW disposal facility at "any" location in California. However, a party may not avoid defects in a pleading by alleging inconsistent facts in a later pleading. (See *Freeman v. San Diego Assn. of Realtors, supra,* 77 Cal.App.4th at p. 178, fn. 3; *Owens v. Kings Supermarket* (1988) 198 Cal.App.3d 379, 383-384 [243 Cal.Rptr. 627].) Ecology's proposed amendment would be directly contrary to its allegation that California *cannot* satisfy its statutory duties under the Southwestern Compact "other than by ensuring" the "*Ward Valley* LLRW disposal facility is expeditiously established." (Italics added.)

Moreover, we agree with the Department that "the acts necessary to establish a LLRW disposal site are anything but 'ministerial,' or 'clear.' " As

reflected in Ecology's allegations, the history of the efforts to establish the Ward Valley site show the discretionary and tenuous nature of the endeavor.

The court properly sustained defendants' demurrer on the writ of mandate cause of action.[7]

### V. *Intervention Order*

Ecology contends the trial court erred in granting three organizations leave to intervene in the action. The organizations are The Committee to Bridge the Gap, the Los Angeles Chapter of Physicians for Social Responsibility, and the Southern California Federation of Scientists (the Organizations).

The Organizations moved to join in the action "to unite with the defendant State of California in resisting [Ecology's] claims . . . ." In support, the Organizations presented evidence showing their interests "are broadly focus[ed] on environmental and safety concerns relating to the Ward Valley site," and described their history of involvement as parties in numerous litigation actions involving the proposed Ward Valley LLRW storage facility. The Organizations stated they were interested primarily in defending Ecology's "prayer for mandatory and/or injunctive relief," and expressed concerns that the fact the complaint alleged damage and mandamus claims "could create incentives for the state to defend the mandamus claims less vigorously out of concern for its exposure to the substantial indemnification and damage claims advanced by plaintiff." Over Ecology's objections, the court granted the motion.

A third party may intervene in an action if (1) the party has a direct and immediate interest in the action; (2) the intervention will not enlarge the issues in the litigation; and (3) the reasons for the intervention outweigh any opposition by the parties presently in the action. (Code Civ. Proc., § 387, subd. (a); *Truck Ins. Exchange v. Superior Court* (1997) 60 Cal.App.4th 342, 346 [70 Cal.Rptr.2d 255].) A trial court has broad discretion in determining whether to permit intervention. (See *People v. Superior Court (Good)* (1976) 17 Cal.3d 732, 737 [131 Cal.Rptr. 800, 552 P.2d 760]; *Jade K. v. Viguri* (1989) 210 Cal.App.3d 1459, 1468 [258 Cal.Rptr. 907].)

The trial court had a reasonable basis to permit the Organizations to join in the action to defend the mandamus claim. The question whether the state should be compelled to permit development of an LLRW disposal facility on

---

[7]Based on our conclusion that mandamus relief is not available to control the exercise of discretion, we do not reach the defendants' arguments regarding standing.

the Ward Valley site was an issue that directly affected the Organizations, and there was evidence showing the Organizations had interests in defending these claims that would not necessarily be adequately represented by the named defendants. (See *Simpson Redwood Co. v. State of California* (1987) 196 Cal.App.3d 1192 [242 Cal.Rptr. 447].)

On remand, however, the mandamus portion of the litigation will no longer be at issue. The sole remaining issue concerns the enforceability of the Department's promises under a promissory estoppel theory. Whether the Organizations would continue to have a direct interest in this narrowed litigation is a question that is properly addressed in the first instance by the trial court. Accordingly, we vacate the trial court's order permitting intervention, and direct the trial court to reconsider its determination based on the changed nature of the litigation. In particular the court should determine whether the Organizations' interest in the promissory estoppel claim is " 'of such direct or immediate character, that the intervener will either gain or lose by the direct legal operation and effect of the judgment.' [Citations.]" (See *Simpson Redwood Co. v. State of California, supra,* 196 Cal.App.3d at p. 1200.)

## DISPOSITION

We reverse the judgment sustaining defendants' demurrer to the promissory estoppel cause of action (fifth cause of action) and the related declaratory relief claim (fourth cause of action). We further vacate the trial court's order granting intervention, and direct the court to reconsider the motion based on the changed nature of the litigation. We affirm the judgment in all other respects. Each party to bear its own costs on appeal.

McDonald, J., and O'Rourke, J., concurred.

The petitions of plaintiff and appellant and defendants and respondents for review by the Supreme Court were denied November 28, 2001. Baxter, J., and Chin, J., did not participate therein.