[No. D042426. Fourth Dist., Div. One. May 25, 2005.]

US ECOLOGY, INC., Plaintiff and Appellant, v.
STATE OF CALIFORNIA et al., Defendants and Respondents.

COUNSEL

Cooley Godward, Stephen C. Neal, John C. Dwyer, Lori R. E. Ploeger and Christopher B. Durbin for Plaintiff and Appellant.

Bill Lockyer, Attorney General, James M. Humes, Chief Assistant Attorney General, Thomas R. Yanger, Assistant Attorney General, John H. Sanders, Donald P. Cole and Jennifer A. Chmura, Deputy Attorneys General, for Defendants and Respondents.

Laurens H. Silver for California Environmental Law Project as Amicus Curiae on behalf of Defendants and Respondents.

## OPINION

**NARES, J.**—On this appeal we are presented with an issue of first impression: whether a plaintiff pursuing a claim for promissory estoppel must prove that the defendant on that claim caused the plaintiff's damages. We conclude that, as in ordinary contract actions, a plaintiff seeking recovery on a promissory estoppel theory must prove that the defendant's breach was a substantial factor in causing the plaintiff's damages. Further, even if we were to conclude that causation is not a necessary element of all promissory estoppel claims, we hold that because promissory estoppel is an equitable remedy, courts have the discretion in an appropriate case to deny relief where the plaintiff cannot demonstrate that the defendant's actions caused the plaintiff's damages. Finally, we conclude that substantial evidence supports the court's decision in this case that defendants' actions were not a substantial factor in causing plaintiff's damages.

In 1985 the State Department of Health Services (the Department) selected plaintiff US Ecology, Inc. (Ecology) to develop and operate California's first low-level radioactive waste (LLRW) storage facility. Ecology and state officials thereafter identified a location for the facility, known as Ward Valley, and completed environmental reviews for that site. However, the facility was never built.

Ecology places the blame on the State of California's (the State's) failure to acquire the Ward Valley site from the federal government. Claiming that it spent millions of dollars in development costs in reliance on the state's promise to use its best efforts to acquire the Ward Valley site, Ecology sued the State, the Department, the Department's director, and the Governor (collectively defendants), alleging breach of contract and promissory estoppel causes of action, and seeking a writ of mandate directing the State to take the necessary steps to acquire the Ward Valley site.

The trial court sustained defendants' demurrer without leave to amend. Ecology appealed, and in a published decision we concluded Ecology had properly alleged a promissory estoppel claim and reversed the judgment as to that cause of action and the related declaratory relief claim. However, we affirmed the judgment in all other respects. (*US Ecology, Inc. v. State of California* (2001) 92 Cal.App.4th 113, 120 [111 Cal.Rptr.2d 689] (*US Ecology*).

After remand, this matter proceeded to a bench trial before the Honorable Eugene Mac Amos, Jr., on the promissory estoppel claim. Following trial, the court ruled in defendants' favor, finding (1) Ecology failed to prove that defendants caused its damages, and (2) the equitable doctrine of unclean hands barred Ecology's recovery.

On this second appeal, Ecology asserts that the court erred in ruling in defendants' favor because (1) it was not required to prove causation on its promissory estoppel claim; (2) the court erroneously used a "but for" test for causation; and (3) the court applied the unclean hands doctrine erroneously because (a) defendants failed to show any evidence that Ecology's actions prejudiced them and (b) Ecology did not commit any misconduct that would support a finding of unclean hands. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

We take much of our factual background section from our previous opinion in this matter (*US Ecology, supra,* 92 Cal.App.4th at pp. 120–126), as well as several federal and state court decisions that have extensively discussed the factual and legal background relating to the present dispute and disposal of low-level waste in general. (*Fort Mojave Indian Tribe v. Department of Health Services* (1995) 38 Cal.App.4th 1574 [45 Cal.Rptr.2d 822] (*Fort Mojave*); *US Ecology, Inc. v. U.S. Dept. of Interior* (D.C. Cir. 2000) 343 U.S. App. D.C. 386 [231 F.3d 20]; *California Dept. of Health Services v. Babbitt* (D.D.C. 1999) 46 F.Supp.2d 13 (*Babbitt*), judgment vacated in part by *US Ecology, Inc. v. U.S. Dept. of Interior, supra,* 231 F.3d 20; *New York v. United States* (1992) 505 U.S. 144 [120 L.Ed.2d 120, 112 S.Ct. 2408].)

In 1980 the United States Congress responded to a crisis involving a dearth of LLRW storage facilities in the country by enacting the Low-Level Radioactive Waste Policy Act, authorizing states to enter into regional compacts that may restrict their disposal facilities to waste generated within member states. (Pub.L. No. 96-573, § 2 (Dec. 22, 1980) 94 Stat. 3347; 42 U.S.C. § 2021b et seq.; *New York v. United States, supra,* 505 U.S. at pp. 150–151.) By 1985 only three approved regional compacts had operational disposal facilities, leaving the 31 states that had not entered into one of these compacts with no assured outlet for their LLRW. (*New York v. United States, supra,* 505 U.S. at p. 151.) To deal with this problem, Congress enacted supplemental legislation requiring the three existing disposal sites to continue accepting out-of-state LLRW through 1992, but permitting approved regional compacts to exclude the waste generated outside each region after 1992. (*Ibid.*)

In 1982 the State Legislature responded to the federal mandate by enacting urgency legislation directing the Department to develop an LLRW management plan that would include plans for short-term storage, the establishment of siting criteria, and the reduction of the amount and toxicity of waste produced. (Stats. 1982, ch. 95, § 3, pp. 307–309; see Health & Saf. Code,

§ 115005.)[1] The legislation authorized the Department to establish and operate, or contract for the establishment and operation of, interim LLRW storage facilities. (Stats. 1982, ch. 95, § 3, pp. 307–309.)

The next year the Legislature added to the statutory scheme by addressing long-term storage needs. This new legislation required the Department to first promulgate regulations for the selection of a private company that would serve as a licensed LLRW operator. (§ 115010.) Within three months of the adoption of those regulations, interested parties were required to file a "statement of capabilities and notice of intention to file an application for a license to receive radioactive materials . . . ." (§ 115020, subd. (a).) Within 45 days, the Department's director was required to select one of the applicants to serve as a license-designee. (§ 115020, subd. (b).) By enacting this legislation, the Legislature sought to assure the safe management of LLRW and "permit and encourage the expeditious establishment and operation by the private sector of a [LLRW disposal facility] . . . ." (Stats. 1983, ch. 1177, § 1, p. 4471.)

In April 1984 the Department promulgated the required regulations. (Cal. Code Regs., tit. 17, § 30470 et seq.) In 1985 the Department selected Ecology as the license-designee. Ecology formally accepted the designation in December 1985 and agreed to be responsible for developing the LLRW facility under the Department's oversight. (*Babbitt, supra,* 46 F.Supp.2d at p. 16.)

In 1987 the State entered into the Southwestern Low-Level Radioactive Waste Compact (Compact) with Arizona, North Dakota, and South Dakota for the construction and operation of an LLRW disposal facility. (*Fort Mojave, supra,* 38 Cal.App.4th at pp. 1582–1583; §§ 115250 et seq., 115255, art. 2, subd. (M) & art. 7.) The Compact obligated the "host state" to "[c]ause a regional disposal facility to be developed on a timely basis [and] [¶] [e]nsure . . . the protection and preservation of public health and safety in the siting, design, development, licensing, . . . and long-term care" of the facility. (§ 115255, art. 4, subd. (E)(1) & (2).) The State agreed to be the host state for the first 30 years of the Compact's existence. (§ 115255, art. 4, subd. (C)(1).)

In 1988 a parcel of land in Ward Valley, California, was selected by the Department as the preferred site for the facility. However, because the site was owned by the federal government and managed by the Bureau of Land Management (BLM), transfer of title to the State would have to be accomplished for construction of the LLRW to proceed. (*Fort Mojave, supra,* 38 Cal.App.4th at p. 1583.) The State and Ecology sought to accomplish this

---

[1] All further statutory references are to the Health and Safety Code unless otherwise specified.

through an "indemnity selection" process, whereby the State would transfer certain lands to the federal government in exchange for the federal government's transfer of the Ward Valley site to the State.

In August 1988 in order to assist Ecology in obtaining financing for the project, the Department and Ecology executed a memorandum of understanding (MOU). The MOU provided that "the State will use its *best efforts* to assure the timely transfer of the relevant site from the federal government to the State . . . ." (Italics added.) Consistent with applicable regulations, the Department also agreed Ecology would be entitled to recover all of its development costs through the rates charged to customers when the facility was in operation. (See Cal. Code Regs., tit. 17, § 30495.)

In 1989 Ecology submitted its project license application. Thereafter, in April 1991, after extensive environmental review, the Department and BLM issued a final joint environmental impact study/report (EIS/R). (See *Babbitt*, *supra*, 46 F.Supp.2d at p. 16; *Fort Mojave*, *supra*, 38 Cal.App.4th at p. 1584.) The report concluded the Ward Valley site was the preferred location for the LLRW storage facility, and the facility would result in no significant adverse environmental impacts. (*Babbitt*, *supra*, 46 F.Supp.2d at pp. 16–17.) In July 1991 the Department issued a draft license to Ecology for public review, as well as a proposed ground lease for the Ward Valley site, which was contingent on the State acquiring the site. (§ 115145, subd. (a).)

About the same time, State Controller Gray Davis, who as controller was a member of the State Lands Commission (SLC), began to publicly oppose the State's efforts to establish a regional LLRW disposal facility within its territory and/or the Ward Valley LLRW disposal facility. The SLC requested the BLM to "suspend processing" its indemnity selection application for the Ward Valley site.

Because of the SLC's opposition to the indemnity selection process, in July 1992 the Department filed an application with the BLM to purchase the Ward Valley site through an alternate method—under the federal Land Policy Management Act's direct sale provisions. (43 U.S.C. § 1713(a)(3).) In January 1993, shortly before the inauguration of President-elect Bill Clinton, outgoing Secretary of the Interior Manuel Lujan announced his intent to issue a record of decision approving the Department's application for direct sale of the Ward Valley site to the State. (*Babbitt*, *supra*, 46 F.Supp.2d at p. 18.) Opponents of the Ward Valley LLRW immediately filed a federal district court action seeking a declaration that the proposed transfer was invalid because it violated the Endangered Species Act (16 U.S.C. § 1531 et seq.). (*Babbitt*, *supra*, at p. 18.) The district court granted a temporary restraining order, enjoined the Secretary from transferring any Ward Valley land, and

scheduled a hearing on the preliminary injunction. (*Ibid.*) Secretary Lujan thereafter issued the record of decision approving the direct sale of the Ward Valley site to the State. (*Id.* at p. 19.) Two additional groups of plaintiffs then filed lawsuits seeking to prevent the proposed sale and development of the Ward Valley site. (*Ibid.*)

Shortly thereafter, the Clinton administration took office. In February 1993 newly appointed Interior Secretary Bruce Babbitt rescinded former Secretary Lujan's record of decision and withdrew approval of the sale of the Ward Valley site to the State. (*Babbitt, supra,* 46 F.Supp.2d at p. 19.) In August 1993 Secretary Babbitt advised California Governor Pete Wilson that a further adjudicatory hearing would be required before transfer of the site. Governor Wilson agreed to Secretary Babbitt's requirement and directed the Department to "work with [Secretary Babbitt's] staff to prepare immediately to pursue this hearing."

In September 1993 the Department licensed the Ward Valley LLRW disposal facility, certified the project's final environmental impact report (EIR), and issued Ecology a license to operate the facility. (See *Fort Mojave, supra,* 38 Cal.App.4th at pp. 1585–1586.) A lawsuit challenging these actions (*Fort Mojave*) was then filed. (*Id.* at p. 1586.) In November 1993 Secretary Babbitt advised Governor Wilson that he would await the outcome of that litigation before proceeding further on the land transfer. In October 1995 a California Court of Appeal rejected the legal challenges filed by project opponents to the Ward Valley license and to the adequacy of the related EIR and EIS/R, and found in favor of the Department. (*Id.* at pp. 1598–1608.)

Three United States Geological Survey geologists, acting in their individual as opposed to official capacities, issued a report, known as the "Wilshire Report," that raised environmental and health concerns about the Ward Valley project. In response, Secretary Babbitt asked the National Academy of Sciences (NAS) to examine the concerns raised in the Wilshire Report. The majority of the NAS panel concluded that (1) the issues raised in the Wilshire Report were either invalid or insignificant; (2) further testing and monitoring of the Ward Valley site was warranted, but construction and operation of the facility could continue during the testing; and (3) there was little likelihood of contamination of the water table or the Colorado River. However, two dissenting members of the NAS panel wrote minority opinions, expressing the opinion that the testing should take place before a final decision was made as to site suitability.

In May 1995 Governor Wilson agreed to implement the substantive recommendations of the NAS majority report and asked for an immediate transfer of the land. Negotiations between the Department of Interior (DOI)

and the State ensued, but there was disagreement relating to the DOI's insistence that it retain an oversight role after transfer of the site, and that third parties be given the right to enforce the NAS recommendations. In September 1995, Ecology's counsel sent a letter to the Department telling it to reject the DOI's proposed conditions and suggesting that if the Department agreed to them, it would be in violation of the MOU and could be held liable to Ecology. In October 1995 the negotiations between the State and the DOI collapsed over the DOI's proposed conditions.

The State thereafter decided to pursue acquisition of the Ward Valley site through federal legislation. A rider containing a transfer of the property to the State was attached to an omnibus spending bill passed by Congress. However, President Clinton vetoed the bill and subsequent efforts at finding a legislative solution were unsuccessful.

In 1996 reports revealed that leakage and migration of contaminants had occurred at Ecology's Beatty, Nevada, LLRW disposal site. Thereafter, Secretary Babbitt announced that the Ward Valley site would not be transferred until after further extensive testing and the preparation of a supplemental EIR. The testing would be conducted by Lawrence Livermore National Laboratory.

Initially, the Department and Governor Wilson were opposed to the additional testing and preparation of a supplemental EIR. The Department also objected to the contractors the DOI proposed to use for the testing, asserting that they were ideologically opposed to the project or radioactive waste disposal in general.

Counsel for Ecology sent letters to Lawrence Livermore National Laboratory and the two scientists the DOI had selected to conduct the testing, warning them not to participate in the DOI's "ill-advised program" and threatening that Ecology would seek compensation from anyone who wrongfully damaged its economic interests.

In 1997 the DOI and the State engaged in further negotiations concerning the site transfer, including a proposal that the State would participate with the DOI in joint testing of the site. However, counsel for Ecology urged the State to reject the proposal, asserting that agreement with the proposal would "violate the State's obligation under the [MOU] with US Ecology to employ its best efforts to acquire the Ward Valley Site in a timely manner, and would cause serious financial injury to the company." Ecology told the State "there could be no form of this agreement that would be acceptable to us" and if the State went along with the proposal "it had better try to mitigate the severe economic injuries that the agreement would cause US Ecology." As a result of Ecology's pressure, the State rejected the DOI's proposal.

In January 1997 the Department filed the *Babbitt* action, petitioning for a writ of mandate in federal district court to direct the court to compel Secretary Babbitt to perform his alleged ministerial duty to convey the Ward Valley site to the State. The Department alleged that Secretary Babbitt's reversal of former Secretary Lujan's record of decision was arbitrary and capricious under the federal Administrative Procedure Act (5 U.S.C. § 706(2)(A)). (*Babbitt, supra,* 46 F.Supp.2d at p. 20.) Three weeks later Ecology filed an action asserting similar claims. The federal court subsequently consolidated the two cases. (*Ibid.*)

In January 1999 Gray Davis became Governor of California. In March 1999 Secretary Babbitt sent Governor Davis a letter inviting him to explore alternatives to the proposed Ward Valley land transfer. Secretary Babbitt also reiterated that the land would not be transferred until after additional substantial environmental testing and preparation of a supplemental EIS/R took place.

In March 1999 the district court in the *Babbitt* action granted summary judgment to the DOI, denying the State's petition to compel a land transfer. The court determined that Secretary Babbitt had a "discernible and reasonable basis" for his decision to rescind former Secretary Lujan's record of decision. (*Babbitt, supra,* 46 F.Supp.2d at p. 24.)

In May 1999 Ecology filed a notice of appeal in the *Babbitt* action. Ecology requested that the Department also appeal the decision, but the Department refused to appeal. In this regard, Governor Davis issued a press release, stating: "Rather than fight a long, protracted appeal over a divisive and controversial site for low level radioactive waste disposal, Governor Davis believes the state must find pragmatic alternatives that are both environmentally sound and make good business sense." The press release also announced that University of California President Dr. Richard Atkinson had agreed to chair an advisory group charged with "proposing ways to find workable alternatives for California's low level radioactive waste disposal." The Atkinson group issued a report in August 2000.

The United States Court of Appeals later dismissed Ecology's appeal, concluding Ecology had no standing on its own and could not base its standing on the Department's status because the Department did not also appeal. (*US Ecology, Inc. v. U.S. Dept. of Interior, supra,* 231 F.3d at pp. 24–26.)

In September 1999, the BLM informed the Department of its intent to terminate all actions related to the State's request for a transfer of Ward Valley. However, the BLM indicated that this action would not preclude the

State from "submitting a new request to purchase the Ward Valley lands in the future." The State did not respond and in November 1999 the BLM issued a decision formally denying the state's direct sale application to purchase the Ward Valley site.

## PROCEDURAL BACKGROUND

### A. *Ecology's Claims*

In June 2000 Ecology filed a first amended complaint against defendants seeking (1) an order directing Governor Davis and the Department to take action to establish an LLRW disposal site in the State; (2) a declaration that the state breached certain binding promises respecting the establishment of an LLRW disposal facility; and (3) money damages resulting from the State's alleged breach.

In that complaint Ecology alleged that Governor Davis entered office "with a design to repudiate the State's commitment to establish the Ward Valley LLRW disposal facility, to shun [Ecology] and to abrogate the State's legal duty to cause the timely establishment of a regional LLRW disposal facility with[in] its territory." Ecology also alleged "the Atkinson Group was specifically instructed by Governor Davis or by his senior staff not to consider the Ward Valley Site, or any other specific disposal site, as a solution for California's LLRW disposal problems" and that the Atkinson Group "will be used by the Davis administration as a pretext for not complying with its statutory and contractual obligations to establish the Ward Valley LLRW disposal facility."

Ecology alleged that the BLM's denial of the State's application to purchase the Ward Valley site was allegedly based "in material part" on BLM's determination that the State no longer intended to establish the Ward Valley LLRW disposal facility.

Ecology further alleged that in November 1999 and January 2000 Governor Davis and the State's Resources Agency Secretary made statements in news media interviews that the Ward Valley project was a "dead issue" and that the State "intended to continue shipping at least 90% of the LLRW generated within California to locations outside of the state." Ecology alleged that Governor Davis did not propose any appropriations for the LLRW disposal program in the 2000–2001 state budget, and all department personnel previously assigned to the program had been reassigned.

Ecology alleged that it satisfactorily completed its duties as the State's license-designee and satisfactorily performed its duties as the State's licensee.

Ecology further alleged it incurred more than $162 million in development costs, including interest on project loans and lost profits, in connection with the Ward Valley LLRW disposal facility.

### B. *Demurrer and First Appeal*

Defendants demurred to Ecology's complaint. In October 2000 the court sustained that demurrer, without leave to amend, and directed that judgment be directed in defendants' favor.

Ecology appealed, and, as noted above, in a published decision this court affirmed the judgment in part and reversed it in part, holding that all of Ecology's claims, with the exception of its cause of action for promissory estoppel, were without merit as a matter of law. (*US Ecology, supra,* 92 Cal.App.4th at p. 131.) With regard to the promissory estoppel claim, we held: "In this case, Ecology alleged facts that fit within the classic model of a promissory estoppel claim. These facts include the following: (1) the Department made promises in the MOU that it would use its best efforts to acquire property from the federal government for use as an LLRW disposal facility; (2) the Department should reasonably have expected these promises to induce action on the part of Ecology; (3) Ecology did in fact detrimentally rely on the promises by spending millions of dollars to develop the facility in anticipation of the federal-state land transfer; and (4) the Department violated its promises by abandoning its efforts to acquire the Ward Valley site from the federal government and there was no justifiable basis for this abandonment. These facts, if true, would support a determination that an injustice would occur if the doctrine were not applied." (*Ibid.*)

### C. *Remand and Trial*

After the matter was remanded to the trial court, it proceeded to a bench trial in February 2003. Following that trial, the court found in defendants' favor, determining that (1) Ecology failed to prove that defendants caused the damages it allegedly suffered, and (2) the equitable doctrine of unclean hands barred Ecology's recovery. The court found that Ecology had proved that it relied upon the promise made by the State to "use its best efforts to assure the timely transfer" of the Ward Valley site, and that the reliance was reasonable and foreseeable until 1997, when actions by the Clinton administration made clear that "DOI's position would be a substantial obstacle to the transfer of the property irrespective of the State's efforts." The court also found that the State used its best efforts to obtain the Ward Valley property during the Wilson administration, but that "a breach occurred after the Davis administration took office . . . ."

However, the court also found that while there was a breach, the State's "failure to pursue the acquisition of Ward Valley was not a substantial factor

in preventing the acquisition of Ward Valley. It would be speculative to conclude the district court's decision would have been reversed on appeal. Further, the federal government consistently opposed transfer unless 1) additional testing was accomplished prior to the transfer, 2) it participated in the testing, and 3) a supplemental EIR was prepared." The court also noted the fact that Secretary Babbitt had rescinded the decision to transfer Ward Valley and that "opposition to the transfer continued after the Davis administration came into power." Therefore, the court concluded that "[t]he evidence does not support the conclusion the federal government would have transferred the property if requested to do so by the Davis administration."

With regard to its finding that Ecology's claim was barred by the doctrine of unclean hands, the court noted that in 1995, when it appeared that the Department might work out an arrangement with the DOI allowing the DOI to have some postconveyance control, "counsel for Ecology wrote a letter to the deputy director and chief counsel of [the Department] urging the state not to enter into such an agreement and suggesting such an agreement would wrongfully interfere with [Ecology's] interest." The court also observed that in 1996, when the State was negotiating with the DOI regarding testing, Ecology advised the potential testing facility that if it "chose to proceed with the testing it '. . . should do so with the knowledge that this action may expose the Laboratory to damage claims by [Ecology].'" The court also pointed out that in 1996 counsel for Ecology sent letters to the scientists who were to perform the tests advising them that should they participate in DOI's "ill-advised project, please do so based on the knowledge that [Ecology] intends to seek compensation from any persons or entities whose conduct wrongfully injures its interest in this matter." Last, the court pointed to a memo to the file written by Ecology's counsel indicating that he had informed State representatives that the DOI's proposal for joint testing "would not be acceptable 'in any form.'" The court concluded that Ecology could not claim that the State "failed to use its best efforts to obtain the property from the federal government while on the other [hand] it continued to make demands rejecting or limiting the scope of any agreement and created obstacles to an agreement conveying the property."

## DISCUSSION

Ecology asserts that the court erred in finding in favor of defendants on its promissory estoppel claim because (1) promissory estoppel claims contain no causation element; (2) the court misapplied the causation element, using a "but for" test; (3) substantial evidence supported a finding that defendants caused Ecology's injury; and (4) the court misapplied the unclean hands

doctrine.[2] We conclude that (1) the court did not err in denying Ecology's promissory estoppel claim on the basis that it could not prove causation; (2) the court did not misapply the causation element; and (3) the court's decision on causation is supported by substantial evidence. Thus, we need not reach the issue of whether the court erred in its application of the unclean hands doctrine or defendants' argument that the judgment should also be affirmed on the grounds that allowing promissory estoppel in this case would defeat a policy designed to protect the public.[3]

## I.

### *Causation as an Element of Promissory Estoppel*

The Restatement Second of Contracts, section 90 (hereafter Restatement section 90), subdivision (1) provides as follows concerning claims for promissory estoppel: "A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires."

California has adopted the Restatement's view on promissory estoppel claims. (*Kajima/Ray Wilson v. Los Angeles County Metropolitan Transportation Authority* (2000) 23 Cal.4th 305, 310 [96 Cal.Rptr.2d 747, 1 P.3d 63] (*Kajima*).) The elements of a promissory estoppel claim are "(1) a promise clear and unambiguous in its terms; (2) reliance by the party to whom the promise is made; (3) [the] reliance must be both reasonable and foreseeable; and (4) the party asserting the estoppel must be injured by his reliance." (*Laks v. Coast Federal Savings & Loan Assn.* (1976) 60 Cal.App.3d 885, 890 [131 Cal.Rptr. 836].)

"Promissory estoppel is 'a doctrine which employs equitable principles to satisfy the requirement that consideration must be given in exchange for the

---

[2] Interestingly, when the court raised the causation issue at trial, counsel for Ecology appeared to concede that it had the burden of proving that defendants' actions were a substantial factor in causing its damages. However, defendants do not assert that this resulted in a waiver of the right to raise the causation issue on appeal.

[3] We do note, however, that Ecology's actions would not appear to rise to the level of misconduct that ordinarily provides the basis for an unclean hands defense. (See *Blain v. Doctor's Co.* (1990) 222 Cal.App.3d 1048, 1063 [272 Cal.Rptr. 250] [plaintiff barred from recovery in action in which he perjured himself]; *Pond v. Insurance Company of North America* (1984) 151 Cal.App.3d 280, 291 [198 Cal.Rptr. 517] [knowing suppression of evidence in prior litigation upon which plaintiff's current malicious prosecution claim was based]; *Elliott v. Contractors' State License Board* (1990) 224 Cal.App.3d 1048, 1055 [274 Cal.Rptr. 286] [plaintiff could not challenge revocation of license that he had obtained through fraud].)

promise sought to be enforced.' [Citation.]" (*Kajima, supra,* 23 Cal.4th at p. 310.) Because promissory estoppel is an equitable doctrine to allow enforcement of a promise that would otherwise be unenforceable, courts are given wide discretion in its application. (*C&K Engineering Contractors v. Amber Steel Co.* (1978) 23 Cal.3d 1, 7–8 [151 Cal.Rptr. 323, 587 P.2d 1136] (*C&K Engineering*); see also *A-C Co. v. Security Pacific Nat. Bank* (1985) 173 Cal.App.3d 462, 472 [219 Cal.Rptr. 62] ["Promissory estoppel has been characterized as a '*peculiarly equitable doctrine* designed to deal with situations which, in total impact, necessarily call into play discretionary powers' "].) This is confirmed by the last sentence of Restatement section 90 that allows courts to limit the remedy of that section "as justice requires." (*C&K Engineering, supra,* 23 Cal.3d at p. 8, italics omitted.)

We could locate no reported cases in California that have analyzed whether a plaintiff on a promissory estoppel claim must prove that the defendant caused his or her damages, as is required in contract actions. (See *Bruckman v. Parliament Escrow Corp.* (1987) 190 Cal.App.3d 1051, 1063 [235 Cal.Rptr. 813] [in contract actions " ' "[i]*n order to establish liability the plaintiff must show that the defendant's breach* was a 'substantial factor' in causing the injury." ' "].) However, one California case stated, without further analysis: "If the requirements of [Restatement section 90] have been met in the instant case, an informal contract (requiring neither assent nor consideration) between the Authority and Argo to award the public works contract to Argo as the [']lowest responsible bidder' resulted [citation] and Argo became entitled at least in some part to *the damages that ensued from the Authority's breach of this informal contract.*" (*Swinerton & Walberg Co. v. City of Inglewood-L.A. County Civic Center Authority* (1974) 40 Cal.App.3d 98, 103–104 [114 Cal.Rptr. 834], italics added, fn. omitted.) Thus, at least in that one case, the Court of Appeal *assumed* without discussion that a causation showing was necessary. Several federal and out-of-state cases have similarly concluded, with little or no analysis, that a plaintiff's damages in a promissory estoppel case must be proximately caused by the defendant's breach. (See *Wiegand v. Motiva Enterprises, LLC* (D.N.J 2003) 295 F.Supp.2d 465, 480 [summary judgment denied on promissory estoppel claim because material issue of fact remained "whether any breach of promissory estoppel was a proximate cause of plaintiff's loss of a job"]; *Rohan v. American Bar Assn.* (E.D.N.Y. 1995) 1995 WL 347035 ["This Court finds that Plaintiff's alleged injuries were not proximately caused by Defendants. Thus, Plaintiff's promissory estoppel claim is not viable against Defendants . . ."]; *Gilbertsen v. Codex Corp.* (D. Minn. 1990) 1990 WL 606165, at *10 [failure

of the defendant's representative to attend meeting as promised would not have had "a material effect" on decision to terminate the plaintiff; relief denied on promissory estoppel claim because not necessary to enforce promise to avoid injustice]; *Chrysler Corp. v. Quimby* (Del. 1958) 51 Del. 264 [144 A.2d 123, 134] [lost profits on promissory estoppel claim recoverable because they were "a direct result of the breach"].) However, a more in-depth analysis of the issue is required here as the question of whether a plaintiff must prove causation on a promissory estoppel claim has been directly raised.

█ Cases have characterized promissory estoppel claims as being basically the same as contract actions, but only missing the consideration element, and therefore the damages recoverable logically are, like in a contract case, limited to those caused by the breaching party. As one court stated, while " '[c]onceptually, promissory estoppel is distinct from contract in that the promisee's justifiable and detrimental reliance on the promise is regarded as a substitute for consideration required as an element of an enforceable contract[,] [t]here appears to be no rational basis for distinguishing the two situations in terms of the *damages* that may be recovered . . . .' " (*Toscano v. Greene Music* (2004) 124 Cal.App.4th 685, 692–693 [21 Cal.Rptr.3d 732].) The Restatement also considers a promissory estoppel claim as equivalent to one for breach of contract: "A promise binding under this section *is a contract*, and full-scale enforcement by normal remedies is often appropriate." (Rest., § 90, com. (d), italics added; see also *Rhode Island Hosp. Trust National Bank v. Varadian* (1995) 419 Mass. 841, 850 [647 N.E.2d 1174, 1179] ["an action based on reliance [e.g., promissory estoppel] is equivalent to a contract action, and the party bringing such an action must prove all the necessary elements of a contract other than consideration"].)[4]

The case *Signal Hill Aviation Co. v. Stroppe* (1979) 96 Cal.App.3d 627 [158 Cal.Rptr. 178] elaborates on this notion that except for its equitable nature and the lack of a necessity for consideration, promissory estoppel claims are akin to contract actions, including the recovery of damages and the proof necessary to recover them. In *Signal Hill* the plaintiff corporation, in reliance on a promise to assign a lease of certain airport property, moved onto the property and commenced making rental payments, repairs, and improvements. The defendant, a corporate officer and director, ultimately refused to execute an assignment of the lease and sublet the now renovated airport property to others for a monthly amount far in excess of

---

[4] It is hardly chance that Restatement section 90 is located in the chapter of the Restatement concerning formation of contracts.

what he was required to pay under the lease. (*Id.* at pp. 632–633.) The trial court awarded the plaintiff those profits the defendant had and would receive from the lease under a promissory estoppel theory, and the Court of Appeal affirmed. (*Id.* at pp. 633–634.) In doing so, the Court of Appeal explained: "Conceptually, promissory estoppel is distinct from contract in that the promisee's justifiable and detrimental reliance on the promise is regarded as a substitute for the consideration required as an element of an enforceable contract. There appears to be no rational basis for distinguishing the two situations in terms of the *damages* that may be recovered; both may involve the problem of ascertaining a future loss of profits, *actually a problem of presenting adequate proof.* Complete contractual recovery may include, under some circumstances, loss of profits *when the loss is definite rather than speculative.*" (*Id.* at p. 640, second & third italics added.) In awarding the full measure of contract damages the court also noted the power of courts to "exercise . . . judicial discretion in promissory estoppel cases to fashion relief to do justice." (*Ibid.*) Thus, in *Signal Hill* the court confirmed two propositions: (1) that for the purposes of damages, promissory estoppel and contract actions may be treated the same; and (2) damages are subject to the same proof requirements as in contract actions. This case provides persuasive authority for treating promissory estoppel claims the same as contract claims when the question is whether a plaintiff's damages are proximately caused by the defendant's breach.

Thus, because promissory estoppel claims are aimed solely at allowing recovery in equity where a contractual claim fails for a lack of consideration, and in all other respects the claim is akin to one for breach of contract, it is logical and proper to require that any claimed damages be caused by a defendant's breach of the agreement. Because promissory estoppel is viewed as an "informal contract," causation must be required as an element that a plaintiff must prove, just as in ordinary contract actions.

Alternatively, the equitable nature of promissory estoppel claims supports a court's decision in an appropriate case to require that a plaintiff prove that its damages were caused by the defendant's breach. As noted above, in applying this doctrine in equity, Restatement section 90 states that a promissory estoppel claim will only lie where "injustice can be avoided only by enforcement of the promise," and "[t]he remedy granted for breach may be limited as justice requires." Comment d to Restatement section 90 states that "the same factors which bear on whether any relief should be granted also bear on the character and the extent of the remedy." Case law has also confirmed that promissory estoppel claims are peculiarly equitable in nature

and courts are given broad discretion to allow or deny such claims. (*C&K Engineering, supra,* 23 Cal.3d at pp. 7–8; see also *A-C Co. v. Security Pacific Nat. Bank, supra,* 173 Cal.App.3d at p. 472.) Further, the determination of whether " ' "injustice can be avoided only by enforcement of the promise," ' " or whether "justice requires" that the remedy granted for breach must be limited, is a determination peculiarly within the court's discretion. (*A-C Co. v. Security Pacific Nat. Bank, supra,* 173 Cal.App.3d at p. 472.)

Scholars have also commented on the peculiarly equitable nature of promissory estoppel claims and the court's power to fashion (or deny) relief as justice dictates. As one stated, "The remedy for promissory estoppel is discretionary. No rigid or mechanical remedy rule applies. The remedy is not necessarily coextensive with damages for contract breach but is equitably molded ad hoc for each case according to the dictates of good faith, conscience, and justice." (Holmes, *The Four Phases of Promissory Estoppel* (1996) 20 Seattle U. L.Rev. 45, 75, fn. omitted.) As Corbin on Contracts puts it, "There is no reason why the courts of the present day should not 'make the remedy fit the crime' and make amount of a judgment for damages depend upon the special circumstances and the merits of all existing claimants." (3 Corbin on Contracts (1996) Promissory Estoppel, § 8.8, p. 21.)

█ Thus, in a promissory estoppel case where the actions of a third party, not the breaching party, cause a plaintiff's damages, a court acts well within its discretion in denying the promissory estoppel claim. Under such circumstances, it would not be necessary to enforce the promise to avoid an injustice. Indeed, it would be manifestly *unjust* to allow recovery in such a situation. A party allowed in equity to pursue a claim for promissory estoppel because it has no enforceable contract should not be placed in a position better than one with an enforceable contract.

Ecology cites out-of-state cases for the proposition that causation is not an element of a promissory estoppel claim. It should be noted first that these cases are not binding on this court. (*Lebrilla v. Farmers Group, Inc.* (2004) 119 Cal.App.4th 1070, 1077 [16 Cal.Rptr.3d 25].) Further, a review of these decisions does not show that the court abused its discretion in denying Ecology's claim because of a lack of causation.

Ecology first cites an Indiana case, *Chow v. TWA* (Ind.Ct.App. 1989) 544 N.E.2d 548. In that case a late flight on TWA caused Chow to miss his connecting flight to Singapore on another airline. TWA promised, but then failed, to make arrangements for Chow to board the next available flight to Singapore, and Chow was forced to buy a more expensive seat on a later flight. The trial court denied recovery on Chow's promissory estoppel claim, finding that "Chow had not shown that his damages were caused by TWA's failure to perform as it had promised because Chow had not established that TWA could have gotten him a discount seat on Singapore [Airlines] even if it had made more timely efforts." (*Id.* at p. 549.)

The Indiana Court of Appeal reversed, holding that "[t]he court erred in engrafting a causation element on the test for promissory estoppel." (*Chow v. TWA, supra,* 544 N.E.2d at p. 550.) However, it appears that the court based its decision upon the equities peculiar to that case: "We do not believe that justice would be served by insisting that Chow demonstrate that diligence on TWA's part would have resulted in Chow flying at the discount rate before we make TWA's promise binding." (*Id.* at p. 550.) Moreover, the court held that Chow only had to make a "prima facie" showing of error because TWA did not file an appellate brief and therefore failed to even address the issue of causation. (*Ibid.*) Here, by contrast, justice would not be served by allowing recovery from defendants for damages that were caused by a third party, not themselves.

Ecology briefly cites another case applying Indiana law, *D&G Stout, Inc. v. Bacardi Imports, Inc.* (N.D.Ind. 1992) 805 F.Supp. 1434, that also held, following *Chow,* that a plaintiff need not prove causation on a promissory estoppel claim. However, in that case the district court merely followed the *Chow* holding without any analysis. (*Id.* at p. 1450.) As we have already discussed, there are also several federal and out-of-state cases that have found, without analysis, proximate cause to be a necessary element to a promissory estoppel claim. Thus, this case, like those previously cited, offers little help to our analysis. Moreover, that case also did not involve the situation presented here where it was asserted that a third party's actions caused the damages.

Finally, Ecology cites a 1948 District of Columbia circuit case, *Goodman v. Dicker* (D.C. Cir. 1948) 83 U.S. App. D.C. 353 [169 F.2d 684]. However, that case did *not* hold that causation is not an element of a promissory estoppel claim. Rather, it only held that the defendant franchisor

could not avoid liability on such a claim brought by a potential franchisee who was promised a franchise by asserting that the franchise was terminable at will. (*Id.* at p. 685.) It again did not involve the situation presented here, where it would be unjust to hold a defendant liable for damages that it did not cause.

Ecology argues that the only element resembling causation for cases seeking reliance damages is contained in Restatement Second of Contracts, section 349 (hereafter Restatement section 349) and that this was a defense that defendants had the burden of proving. In support of this assertion, Ecology also cites *Westfed Holdings, Inc. v. United States* (Fed.Cl. 2002) 52 Fed.Cl. 135, which interpreted Restatement section 349.

Concerning reliance damages, Restatement section 349 provides as follows: "As an alternative to the measure of damages stated in [Restatement section] 347, the injured party has a right to damages based on his reliance interest, including expenditures made in preparation for performance or in performance, *less any loss that the party in breach can prove with reasonable certainty the injured party would have suffered had the contract been performed.*" (Italics added.)

Focusing on the language in Restatement section 349 stating "less any loss that the party in breach can prove with reasonable certainty the injured party would have suffered had the contract been performed," Ecology argues that if there is any causation element in a promissory estoppel claim seeking reliance damages, this is its expression. That is, defendants could argue that even if they had performed, Ecology would have suffered damages anyway because the federal government still would not have transferred Ward Valley to the State. Ecology then points out that the relevant phrase from Restatement section 349 states that the burden of proof is on a defendant to prove such a defense to damages. (See *Westfed Holdings, Inc. v. United States, supra,* 52 Fed.Cl. at p. 155 ["To the extent that defendant argues that [plaintiff's] damages should be offset by losses that [plaintiff] would have sustained had the contract been fully performed, defendant bears the burden of proof"].)

However, Restatement section 349 merely states an alternative measure of damages for *contract* actions, not promissory estoppel claims. (See Rest.2d, § 347.) Moreover, even if it is applicable to promissory estoppel claims to the extent they seek reliance damages, it does not purport to state

the *elements* of a promissory estoppel claim, only the *measure* of reliance damages. As we have expressed above, we conclude that in pursuing a promissory estoppel claim, a plaintiff bears the burden of proving, as in an ordinary contract claim, that the defendant's breach caused its damages. This is particularly true where it is alleged that a third party, not the defendant, caused the plaintiff's damages, and it would be inequitable to shoulder a defendant with damages that it did not cause.

## II.

### *Proof of Causation*

Ecology asserts that the court erred in finding that it did not prove that its damages were caused by defendants' breach because it improperly used a "but for" standard instead of a "substantial factor" standard, and under the appropriate test, the court would have ruled in its favor. This contention is unavailing.

### A. *Standard of Review*

■ Ecology asserts that in questioning the finding that respondent's breach did not cause its damages, it is seeking review of a question of law, subject to de novo review. However, as Ecology is asserting that it offered sufficient evidence to show that defendants' actions caused its damages, and attacks the sufficiency of the evidence for the court's finding otherwise, this issue is subject to the substantial evidence standard of review. (*Vine v. Bear Valley Ski Co.* (2004) 118 Cal.App.4th 577, 586 [13 Cal.Rptr.3d 370].)

Under this standard of review, our duty "begins and ends" with assessing whether substantial evidence supports the verdict. (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 873–874 [197 Cal.Rptr. 925], italics omitted.) "[The] reviewing court starts with the presumption that the record contains evidence to sustain every finding of fact." (*Tesseyman v. Fisher* (1952) 113 Cal.App.2d 404, 407 [248 P.2d 471].) We review the evidence in the light most favorable to the respondent, resolve all evidentiary conflicts in favor of the prevailing party and indulge all reasonable inferences possible to uphold the jury's verdict. (*San Diego Metropolitan Transit Development Bd. v. Handlery Hotel, Inc.* (1999) 73 Cal.App.4th 517, 528 [86 Cal.Rptr.2d 473].)

B. *Analysis*

■ The test for causation in a breach of contract (or promissory estoppel) action is whether the breach was a substantial factor in causing the damages. (*Bruckman v. Parliament Escrow Corp.* (1987) 190 Cal.App.3d 1051, 1063–1064 [235 Cal.Rptr. 813].) "Causation of damages in contract cases, as in tort cases, requires that the damages be proximately caused by the defendant's breach, and that their causal occurrence be at least reasonably certain." (*Vu v. California Commerce Club, Inc.* (1997) 58 Cal.App.4th 229, 233 [68 Cal.Rptr.2d 31].) A proximate cause of loss or damage is something that is a substantial factor in bringing about that loss or damage. (BAJI No. 3.76; *Mitchell v. Gonzales* (1991) 54 Cal.3d 1041, 1052–1053 [1 Cal.Rptr.2d 913, 819 P.2d 872].) The term "substantial factor" has no precise definition, but "it seems to be something which is more than a slight, trivial, negligible, or theoretical factor in producing a particular result." (*Espinosa v. Little Co. of Mary Hospital* (1995) 31 Cal.App.4th 1304, 1314 [37 Cal.Rptr.2d 541].)

For example, in *National Medical Transportation Network v. Deloitte & Touche* (1998) 62 Cal.App.4th 412 [72 Cal.Rptr.2d 720], the plaintiff was a business that retained the defendant auditors to issue an opinion that the plaintiff intended to use to encourage a third party to invest in the business. The plaintiff sought damages for breach of contract when the auditors failed to issue the opinion and the third party did not invest in the plaintiff's business. The Court of Appeal held that the plaintiff had not shown causation because whether the third party would have invested absent the defendant's breach was "at best speculation." (*Id.* at p. 438.)

■ Here, the court found that defendants' breach after the Davis administration came to power "was not a substantial factor in causing damage to Ecology since the federal government continued to resist the transfer." The court also found that defendants' "failure to pursue the acquisition of Ward Valley was not a substantial factor in preventing the acquisition of Ward Valley." Thus, contrary to Ecology's assertion, the court understood that it was required to apply a substantial factor standard. Further, even if any portion of the court's opinion implied a "but for" analysis, this is of no moment. We do not review the rationale for the court's decision. Rather, if there is substantial evidence to support the result under the correct standard, we will affirm. (*In re Marriage of Burgess* (1996) 13 Cal.4th 25, 32 [51 Cal.Rptr.2d 444, 913 P.2d 473].)

Substantial evidence supports the court's finding on a lack of causation as defendants' actions were not a substantial factor in causing Ecology's damages, i.e., it is not reasonably certain that the federal government would have transferred Ward Valley had defendants continued to use their "best efforts" after the Davis administration came to power. Secretary Babbitt had rescinded the original decision to transfer Ward Valley, and the Clinton administration's opposition to a transfer by the DOI continued after the Davis administration came to power. As the court found, the federal government consistently opposed transfer unless 1) additional testing was accomplished prior to the transfer, 2) it participated in the testing, and 3) a supplemental EIR was prepared. As Secretary Babbitt stated in a letter to Governor Davis: "Among other things, an extensive program for the testing and analysis of tritium and related substances at the site would have to be conducted. The results of the testing and analysis would have to be included in a comprehensive supplemental environmental impact statement." Indeed, Ecology itself opposed such conditions being put on a possible transfer and threatened the State not to agree to such terms. Further, as the court also found, it would be speculative to conclude the district court's decision in the *Babbitt* action would have been reversed on appeal, even had California elected to pursue an appeal.

The evidence does not support the conclusion it was likely that the federal government would have transferred the property if requested to do so by the Davis administration. Any such outcome was speculative at best. Indeed, as the court found, it was no longer reasonable for Ecology to expend monies in reliance on defendants' promise to use their best efforts to obtain the Ward Valley property as of 1997, because actions by the Clinton administration made clear that the DOI's position would be a substantial obstacle to the transfer of the property *irrespective of the State's efforts.*

Ecology asserts that there was substantial evidence presented that defendants' breach was a substantial factor in causing its damages based upon the fact that after the State abandoned efforts to acquire Ward Valley in 1999, the federal government did not foreclose the possibility that the State could renew its pursuit of the site at a later date. However, simply because the federal government would not foreclose a future application to have the Ward Valley site transferred does not mean that it had changed its position as to the merits of such an application. That evidence does nothing to change the speculative nature of Ecology's damages. Substantial evidence supports the court's finding that defendants' breach "was not a substantial factor in causing damage to Ecology."

## DISPOSITION

The judgment is affirmed.

McConnell, P. J., and Haller, J., concurred.